### NATIONAL LABOR RELATIONS BOARD v. AMERICAN MFG. CO. (NU–ART EMPLOYEES, Inc., Intervenor).

### No. 362.

Circuit Court of Appeals, Second Circuit.

July 26, 1939.

Mortimer B. Wolf, Samuel Edes, and Owsley Vose, all of Washington, D. C. (Charles Fahy, Gen. Counsel, and Robert B. Watts, Alvin J. Rockwell, Associate Gen. Counsel, all of Washington, D. C., of counsel), for petitioner National Labor Relations Board.

Thomas F. Magner, of Brooklyn, N. Y., (Daniel G. Connolly, of Brooklyn, N. Y., of counsel), for respondent American Mfg. Co.

Arthur F. O'Brien, of Brooklyn, N. Y., for intervenor-respondent Nu-Art Employees Inc.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of an order requiring respondent American Manufacturing Company (herein called the Company) to cease and desist from certain unfair labor practices. Upon charges and amended charges filed by the Textile Workers Organizing Committee (herein called T.W.O.C.), an affiliate of the C.I.O., the Board issued its complaint on July 27, 1937, and caused it to be served with notice of hearing upon the Company, the Company Union of the latter, and the Collective Bargaining Committee formed by the Company about June 1, 1937 (herein called the Committee). The intervenor Nu-Art Employees, Inc. (herein called Nu-Art), a union of the employees of the Company formed by the latter about July 14, 1937, was served with the complaint, and amended complaint, on August 11, 1937.

The amended complaint alleged (a) that the Company urged, persuaded and warned its employees under threat of discharge and other reprisals to refrain from becoming or remaining members of T.W.O.C., which a majority of them had in May, 1937, joined and designated as exclusive bargaining agent; (b) that about May 29, 1937, and thereafter, the Company refused to bargain collectively with its employees through T.W.O.C., although that Union represented the majority in its Nu-Art Fibre Products Department, an appropriate unit; (c) that about June 1, 1937, the Company formed the Committee for the purpose of dealing with its employees concerning grievances, labor disputes and conditions of employment and about June 4, 1937, coerced its employees to sign individual contracts providing for

bargaining by the Committee and containing various unlawful provisions and also to sign false statements to the effect that the individual contracts had been executed voluntarily; (d) that about June 29, 1937, the Company discharged, and thereafter refused to reinstate, sixteen of its employees because of membership in T.W.O.C. and of activity in its behalf; (e) that about July 1, 1937, the Company formed and dominated the labor organization of its employees known as Nu-Art Employees, Inc.; (f) that because of the unfair practices of the Company other employees went on strike; and (g) that by reason of the foregoing the Company was engaging in unfair labor practices within Section 8 (1), (2), (3) and (5), 29 U.S.C.A. § 158 (1–3, 5).

The Company filed its answer to the complaint denying that it had engaged in unfair labor practices and thereafter Nu-Art filed its answer to the same effect. Neither the Company Union, nor the Committee, filed answers but the Company's counsel stated that he was appearing on behalf of the Committee for the limited purpose of protecting a contract dated June 4, 1937, between the Company and the Committee regulating the labor relations between the Company and its employees.

The Board made findings to the effect that the Company engaged in unfair labor practices by circulating petitions among its employees repudiating T.W.O.C.; by holding a socalled election whereby the Committee was chosen to represent the employees; by causing the latter to sign individual unlawful contracts and by threats that members of T.W.O.C. would be discharged and that the Company would sooner shut down the Nu-Art Department than to let the C.I.O. come in; by refusing to bargain collectively with T.W.O.C. when that organization represented a majority of the employees in an appropriate unit; by discharging sixteen employees because of their membership in and their activity on behalf of T.W.O.C.; by refusing to reinstate a number of employees who on June 29, 1937, had gone on strike because of the Company's unfair labor practices, and by dominating and interfering with the formation and administration of Nu-Art and contributing support to it.

Upon the basis of the foregoing findings of fact the Board determined (a) that the Company had engaged and was engaging in unfair labor practices within the meaning

of Section 8 (1) in that it had interfered with, restrained or coerced its employees in their rights to self organization, to form or join labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection; (b) that it engaged in unfair labor practices within the meaning of Section 8 (2) in that it dominated or interfered with the formation or administration of Nu-Art and contributed support to that organization; (c) that it engaged in unfair labor practices within the meaning of Section 8 (3) through discrimination in regard to hire or tenure of employment and other terms or conditions of employment; (d) that it engaged in unfair labor practices within the meaning of Section 8 (5) by refusing to bargain collectively with representatives selected by the majority of its employees.

The Board ordered the Company to take affirmative action in order to effectuate the policies of the Act (1) by offering reinstatement with back pay to the sixteen named employees who on June 29, 1937, were discharged; (2) by offering reinstatement to those striking employees who were refused reinstatement, together with back pay from the date of such refusal; (3) by withdrawing all recognition from Nu-Art as representative of the employees for the purpose of collective bargaining; (4) by (upon request) bargaining collectively with T.W.O.C. as the exclusive representative of the employees of the Nu-Art Department except supervisory and clerical employees.

█ The principal question is whether the Board's findings of fact with respect to unfair labor practices have a substantial support in the evidence. In answering this question it is necessary to refer to the organization of the Company Union which was set up in 1936, about a year prior to the formation of Nu-Art. The Company had had some trouble in Philadelphia and did not want any outside labor organization to inject itself into the Brooklyn plant. They, therefore, organized a Company Union. Its character as such is not questioned. Its constitution and by-laws were evidently furnished by the Company. The choice of the delegates was essentially that of the Company and any meetings held by the delegates were attended by Fardy, the personnel manager, who would listen to complaints that might be presented and, on numerous occasions, redressed grievances. The organization apparently had no expenses and held its meetings in the Company plant and on the Company's time; the members paid no dues and the organization was such as to justify the conclusion that it was no more than a clearing house for complaints, and not a real bargaining agent or indeed an independent representative of the employees in any respect. Finally, in April, 1937, Filley, the president of the Company, told Fardy that "a Company Union would no longer exist" and directed the latter to inform the delegates of the fact, whereupon the Company Union apparently expired.

At the time of the organization of the Company Union certain supervisory employees took an active part in the formation of this Union and also in the later transactions which the Board found constituted unfair labor practices on the part of the Company. Among them were Josephine Gulino, who was assistant to Anderson, the chief foreman in charge of the Nu-Art Department of the Company. She handed out cards and requested employees to join the Company Union. Margaret Schwartz, who was referred to by Fardy as a foregirl (Record, p. 1313), and had the duty of seeing that the work was properly done in the twisting room, also called one of the employees to her desk and told her to sign a card joining the Company Union. Matusza, Gosslein and Cartello held supervisory positions in the Nu-Art Department under Anderson, who testified that they transmitted his orders to the men since the Department was too much for him to handle alone. While Matusza, Gosslein and Cartello had not the power to discharge, the men believed that they had it and regarded them as foremen. There was testimony before the Board that they solicited memberships in the Company Union during working hours.

In April, 1937, some of the employees began to discuss the advantages of organization with the result that one of their number went to the T.W.O.C. headquarters and obtained literature and pledge cards which were thereafter distributed and a campaign for members of that union began which resulted in its obtaining a majority membership among the employees of the Nu-Art Plant.

The Company was aware that the T.W.O.C. was making strides in obtaining memberships and that many weavers had joined.

Accordingly Fardy, after consultation with Filley, approached several weavers on May 14th and requested a meeting on Saturday morning, May 15. The apparent purpose for calling the meeting was, as expressed by Fardy, that "there is a lot of underground work going on around here" and "the company should have a chance to defend themselves." The men who came to the meeting wrote out certain complaints regarding working conditions and wages, most of which were at once granted by Anderson and Fardy. The employees who came were paid for their time although the great majority did not normally work on Saturday.

On May 21, 1937 one Rosenberg, who was the T.W.O.C. representative, advised Filley that T.W.O.C. represented a majority of the employees of the Nu-Art Department, and a meeting was arranged for May 29th for the purpose of collective bargaining. The meeting was held on the latter date and Filley did not question the claim of Rosenberg that T.W.O.C. represented a majority of the employees of the Nu-Art Department.

The discussion at the meeting related chiefly to wages. The Company asserted that it was already paying more than its competitors and had in effect a minimum wage of $29.70 per week for weavers. Rosenberg apparently was unaware of the minimum wage because it had only been in effect about two weeks. Rosenberg suggested that the T.W.O.C. investigate competitive conditions in the industry and the meeting ended with a promise by Filley that he would meet again with the T.W.O.C. upon notification.

After June 3, 1937, Rosenberg called the Company on the telephone but could not get in touch with Filley either on that or on several days following. On June 8 he called again and reminded Brown, the vice-president, of the arrangement to negotiate an agreement with the T.W.O.C. He was then informed that the Company felt that T.W.O.C. "didn't represent a majority of the workers, and they would not deal with us as an agency representing the workers."

The Company attempts to justify its refusal on June 8 to bargain with T.W.O.C. on the ground that a majority of its employees had already voluntarily withdrawn from membership in that Union and had chosen another bargaining agent of their own. We think that the over-

ruling of this contention by the Board is based on substantial evidence.

During the first week in June petitions were circulated among the employees of the Nu-Art Department of which the following is a type: "We the undersigned agree to work under present conditions for the Nu-Art. We withdraw from the C.I.O. and do not want any outside representation."

The signatures to the petitions were obtained by Margaret Schwartz, who had been active in soliciting members in the original Company Union and by another employee named Bradbury. Bradbury secured signatures in his own department on June 4, and then, as he testified, sought to obtain the signature of Margaret Schwartz, but she informed him that "they were also getting a petition up." It is important to note here that Anna Covaleski, one of the employees, testified that on June 2 Margaret Schwartz had presented a sheet to her for signature and said: "Everybody else is signing it. If you don't sign it Friday is going to be the last for you." Covaleski added that while she did not sign it some of the others did. Bradbury testified that he asked Schwartz to make copies of his petition and agreed to obtain signatures for her petition. These petitions, claimed to have been drawn up independently by Bradbury and Schwartz, were similar in wording, and Bradbury testified that all the foremen were around when he passed the petitions. Most of the signatures were apparently obtained by Bradbury and Schwartz on the morning of June 4 and the signed petitions were then placed in the office of Superintendent Anderson.

On June 3, 1937, Fardy was called into Filley's office where he found Brown, the vice-president of the Company, and Connolly, its attorney. Mr. Connolly thereupon gave Fardy certain "designation" sheets to be used for the socalled election of a bargaining representative the following day. These sheets read as follows:

"We, the undersigned employees of the American Manufacturing Company, hereby notify you that we have this day re-confirmed our delegate, ———, who has represented us in the past in collective bargaining with you, as our representative of our particular department or sub-division of a department to bargain collectively with you in conjunction with the duly elected representatives of the other subdivisions and departments of the Brooklyn plant. We authorize this representative to cooperate with

the representatives of the other sub-divisions of the Brooklyn plant to enter into and to sign a contract with the company, provided it contains substantially the provisions outlined to us by our representative.

"This authorization is to supersede any prior authorization we may have heretofore granted, and we hereby revoke and cancel any such prior authorization to any other person or group, and hereby certify that no one else is authorized to represent us in collective bargaining with the company."

As is apparent, these "designation" sheets contain a blank with room for inserting but one name for a delegate although a single sheet only was given out for each division in the Nu-Art Department. Accordingly, they formed no basis for a choice of a committee by the employees signing them and, as a means of electing delegates to bargain for the employees, were a complete farce. They were handed by Fardy to Anderson, who had them distributed for signature by different employees, including Margaret Schwartz, whose activity the same morning in preparing a petition for repudiation of T.W.O.C. has just been mentioned. After the sheets were signed they were taken to Filley by Fardy, who testified that he never heard of the results of the vote and to his knowledge no announcement of the result of the election was made to the employees.

On June 4, the very day of the socalled election, president Filley himself gave Fardy a number of mimeographed copies of certain proposed contracts with the employees to which were attached covering letters which stated that "our normal work has been disrupted by agitation caused by outsiders who claim to represent a small minority of your fellow-workers." The letter also said: "We have met with your duly authorized representatives and have requested them to get a confirmation of their right to represent their fellow-workers in their respective sub-divisions of the plant. We have offered them a contract to be entered into between the company and the collective bargaining committee of each individual employee." There was evidence from which the Board might find that these statements in the letter misrepresented the true facts. The T.W.O.C. had, at least shortly before, represented a majority of the employees. The Company could not have met with "duly authorized representatives" and offered them a contract because the contract was distributed within an hour of the alleged election of the delegates on the day shift and prior to the election of the delegate from the night shift. Moreover, the Company did not produce a single witness to testify to any negotiations with such representatives. In the letter the Company made the following statement as to its policy: "While the company is willing to enter into a written contract with its own employees, it has come to the conclusion that it will not sign a contract with any union or have a closed shop in its plant."

It seems apparent from what we have already stated that no Committee existed and that the contract was not the result of any collective bargaining. The signatures of the socalled Committee were never annexed to the contract and no attempt was made to obtain them.

While the contract purported not to restrain the employees from having a Union representing them or advising them in collective bargaining, it provided that they should "not have the right to demand a closed shop or a signed agreement by the Employer with any union" and that "the Employer has the absolute and unqualified right to hire or discharge any employee or employees for any reason, or for no reason, and regardless of his or their affiliation or non-affiliation with any union * * *." The agreement provided that no employee should be discharged because of "legitimate union activities or affiliation with any union", but it stipulated that "the question of an employee's discharge is in no event to be one for arbitration or mediation and that any action of reinstatement, if any, will be taken voluntarily by the Employer if it deems such reinstatement advisable." The agreement also provided that "the Employees agree that henceforth and during the entire period of this agreement to June 1, 1942, they, or any of them, will not go out on strike." The contract could hardly have been better calculated to discourage, if not to deprive, the employees of their right to bargain collectively through representatives of their own choosing. We held the procurement of just such a contract an unfair labor practice in National Labor Relations Board v. National Licorice Company, decided June 12, 1939. We also held in National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97, 100, that a similar contract

deprived the employees of rights guaranteed them by the Wagner Act.

The Board also relies upon certain acts of alleged intimidation by foremen of Nu-Art, and by Anderson, in which they (1) made derogatory remarks about the C.I.O., (2) made veiled threats that employees active in the Union would be fired, e. g., "you will have to get a new pair of shoes", and (3) asserted that the plant would close if the C.I.O. got in. Some of the remarks relied upon are not particularly significant but the Board could properly find that the speakers occupied positions of authority and represented the Company in thus interfering with the rights of the employees even though all of them did not have the power to hire or discharge directly.

[4] The cessation by the Company on May 29, 1937, of all dealings with T.W.O.C. as bargaining agent for the majority of the employees; the commencement immediately thereafter of acts of interference with and coercion of the employees in the exercise of their rights of self-organization, followed by the refusal of the Company on June 8 to bargain with T.W.O.C. on the ground that it no longer represented the majority, are matters supported by substantial evidence and indicate, as found by the Board, that the Company did not at any time in good faith bargain collectively with T.W.O.C. The preparation by the Company on June 3, 1937, of the letter and contract distributed on June 4 is entirely inconsistent with the claim that the majority of the employees voluntarily withdrew from the T.W.O.C. We think that the Board could properly discredit testimony indicating that Margaret Schwartz and Bradbury acted independently in promoting the repudiation of T.W.O.C. The events accompanying the execution and distribution of the various papers, and the former activity of Margaret Schwartz in the Company Union, furnish substantial arguments in the other direction.

 On June 28, 1937, the Company wrote a letter to its employees in the Nu-Art Department that T.W.O.C. had charged that the contracts of June 4, were not voluntarily signed but were obtained by coercion. The letter requested each employee to confirm that contract in writing and to certify that it was signed voluntarily and without any compulsion. That night the T.W.O.C. shop committee of the Nu-Art Department employees met to consider the situation at the plant and decided that it had become essential to endeavor to induce the Company to resume negotiations with T.W.O.C. In order to accomplish this, the shop committee determined to have the weavers in the Nu-Art Department temporarily stop work the next morning while it called upon the Company officials concerning the resumption of Union negotiations. Pursuant to this plan, at ten o'clock in the morning of June 29, without the use of any force and without any disorder, all the weavers stopped their looms; immediately thereafter the shop committee told Anderson and Fardy, who were in the weaving rooms, that the stoppage had taken place in order to get a promise from the Company that it would meet and bargain collectively with T.W.O.C. representatives. Anderson, who in the absence of Filley and Brown was in charge of the plant, refused to talk to the committee and told the employees to go back to work. A little later, Anderson approached the meeting of the employees with the shop committee which was being held in a back room of the plant and ordered the men either to return to work or to leave the premises. Some of the men returned to work and others stood around in groups talking. At noon most of the weavers went out to lunch and on returning with the intention of going to work were stopped at one of the entrances and fourteen were discharged. Two others who had not left the building were discharged during the noon hour. The other weavers were admitted.

The Board found that the discharge of the sixteen men was for their T.W.O.C. activities and was, therefore, discriminatory and an unfair labor practice. The Company asserts that the discharge was because of refusal of the men to obey the direction of Anderson to go to work or to leave the premises. Some of these men, and Robinson and Greco in particular, were leaders in T.W.O.C. activities and in the demands for resumption of bargaining. Others of them were members of special T.W.O.C. committees and all were members of that Union. It is true that some of them in respect to mere membership were in no different position from men that were retained in employment. It would seem to be a reasonable inference, however, that the discharge was discriminatory when a few men were discharged and nearly three-quarters of the force in the Nu-Art Department, who likewise did not return to

work on the morning of the strike, were not. To be sure Anderson testified that only the sixteen employees refused to obey orders and go back to work, but there was plenty of testimony to the contrary which the Board was at liberty to credit. Furthermore, Robinson's testimony that Anderson discharged him with the remark: "Joe, it has been a pleasure to work with you up until about six weeks ago", indicated that the real reason for the discharge was T.W.O.C. activities. But whether or not the discharge was discriminatory, it cannot be justified for the reason that the men went on strike because of the unfair labor practices of the Company in refusing to bargain with them collectively and in interfering with their rights of self-organization. They, therefore, remained employees and the Board had discretion to order them reinstated with back pay. We do not regard the action of these or other employees in standing around the premises for a period of not more than two hours, while an attempt was being made to persuade the Company to fix a date for collective bargaining with T.W.O.C., as in the nature of a sit-down strike which would permit the termination of the employee relationship. They certainly were not claiming to hold the premises in defiance of the right of possession of the owner and we regard the case as no different from that of an ordinary strike where work has ceased because of an unfair labor practice.

■ A number of other employees went out on strike on or shortly after June 30 as a result of the discharge of the sixteen men on June 29, and of the refusal of the Company to bargain collectively with the T.W.O.C. On July 27, these strikers sought reinstatement but were told that they would have to sign the individual contract of June 4, which we have discussed heretofore, and would also have to file applications as new employees and to pass a medical examination. While agreeing to sign the individual contract they refused to waive their seniority rights by filing applications as new employees. The refusal to reinstate these strikers except on condition that they gave up their seniority rights, as well as certain rights to bargain collectively, constituted new unfair labor practices that had not been the cause of their strike. Accordingly, the Board might in its discretion require these men to be reinstated with back pay from July 27, 1937, and its order is to that effect.

■ On or about July 14, 1937, certain employees of the Nu-Art Department organized the Nu-Art Employees, Inc., an independent union, which the Board found had been dominated and interfered with in its formation by the Company in violation of Section 8 (2) of the Act. In this instance, as in obtaining repudiations of T.W.O.C. on June 4, Schwartz and Bradbury were active in suggesting and promoting the organization of the union. Josephine Gulino, the secretary or assistant of Anderson, was also active and was one of the first persons to consult an attorney for this union. She also distributed cards for the union repudiating T.W.O.C. She was the employee who nominated the union chairman and herself held the office of secretary and handled all the finances. Up to the time of the hearing Nu-Art had not made any attempt at collective bargaining with the Company although the latter, since the strike, reduced the working week and thus the employees' salaries. The Company through its letter and individual contracts of June 4 showed that it was patently hostile to outside unions, and various supervisory employees advised several workers to form an independent union. Finally, the Company threw its support to Nu-Art by recognizing it as representing the majority without asking for formal proof, providing it with rent-free meeting facilities at the plant, and permitting meetings during usual working hours. In view of the identity of the persons who were most active in the formation of this union, and the similarity of the means employed to repudiate T.W.O.C. and to set up the new organization, we think it stands in the same position as the attempted bargaining committee of June 4 and the Company Union of 1936 and that the Board could properly order it disestablished, as it has done.

■ Under paragraph 2(f) of the Board's order it is provided that upon request the Company shall bargain collectively with T.W.O.C. as the exclusive representative of the employees of the Nu-Art Department. This order was made on November 16, 1937, and the matters in question occurred two years ago. While we hold that there was substantial evidence before the Board on which they might find that T.W.O.C. had not then been displaced as bargaining agent, we feel no certainty that this union is at present the choice of the employees, particularly in view of the fact that it was stipulated in the record that a majority

of the employees, if called as witnesses, would testify that they do not want the T.W.O.C. of the C.I.O. to represent them in collective bargaining with the Company. We therefore hold, as we did in National Labor Relations Board v. National Licorice Co., 2 Cir., 104 F.2d 655, that the part of the order requiring collective bargaining with T.W.O.C. be made conditional upon the Board's ascertaining by an election whether that union is now the choice of the majority.

We have considered the objections of Nu-Art Employees, Inc., and the Company that they were not seasonably and properly advised of the charges against them and find them to be without merit.

An order should be entered granting enforcement to the extent indicated in the foregoing opinion.