NATIONAL LABOR RELATIONS BOARD
v. ACME AIR APPLIANCE CO., Inc.
No. 120.

Circuit Court of Appeals, Second Circuit.
Feb. 3, 1941.

418

CLARK, Circuit Judge, dissenting in part.

Charles Fahy, Gen. Counsel, Robert B. Watts, Asst. Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Lewis M. Gill, Mary Lemon Schleifer, and Maurice J. Nicoson, all of Washington, D. C., for petitioner, National Labor Relations Board.

Horace G. Marks, of New York City (Horace G. Marks and Milton M. Siegel, both of New York City, of counsel), for respondent, Acme Air Appliance Company, Inc.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a proceeding to enforce an order of the National Labor Relations Board. The respondent, hereinafter called Acme, is a New York corporation engaged in the business of manufacturing and selling air valves, air gauges and other air appliances used in connection with automobiles, bicycles and related products.

On October 11, 1937, eight employes of Acme, who then were members of the United Electrical Radio and Machine Workers of America, a labor union affiliated with the C. I. O., hereinafter called United, went on strike in protest against Acme's dismissing and refusing to reinstate two employes who were members of the union, and picketed the plant. At the invitation of Acme, a union committee met with Acme's management and presented the United's demands. The management promised to reply to the demands after the pickets were removed. The pickets were thereupon withdrawn, the demands of United were acceded to and the strikers returned to work. By October 11, 1937, most of Acme's employes had signed cards authorizing United to represent them "for the purpose of collective bargaining in regards to wages, hours and working conditions for a period of one year", and by October 25, 1937, 74 out of 77 employes working at its plant had applied for membership in United and had appointed it their bargaining agent.

On October 11, 1937, union employes held a meeting with Gilbert, the union organizer, a shop committee was elected and a proposed contract of employment was drafted. On October 12, 1937, Gilbert came to the Acme place of business and met the attorney, the manager and the president and vice-president of the company. He testified that he then stated to the management that as a representative of Local 1223 of United his union had a considerable majority of the Acme employes and that it was entitled to sole and exclusive bargaining rights for all employes in the plant. He testified that he, therefore, requested Acme to recognize the union as bargaining agent and to set a time and place for a collective bargaining conference. He said that the management replied that it was not in a position to give an answer to his request or to recognize the union and that the latter would have to wait. He also said that it was agreed to wait for a conference until October 14 and that any contract would be retroactive as of that date. He further testified that at a meeting with the management on October 14 he was handed a paper addressed to the workers, rather than the union, which recited that after Acme had already made certain concessions to its employes it was "met with the demand for immediate union recognition" and said "we cannot accede to one demand today and tomorrow be met

with new demands, and have the threat of a strike every day over our heads. * * *" The paper finally said: "Put what you want in writing. Submit it to your employers, give them time to think it over, discuss it amongst themselves, seek outside advice and then we can give you a reasonable answer and leave the door open to reasonable discussion."

United then prepared a proposed contract dealing with wages, hours and other conditions of employment, which was mailed to Acme on October 15 and was accompanied by a letter requesting Acme to set a date for a conference early the next week. On October 20, 1937, Gilbert said that he asked Acme's attorney whether it had made up its mind as to when it was "ready to sit down to a collective bargaining conference and recognize the union" and the attorney replied it was not yet ready to commit itself because it needed time to "look into finances." Gilbert reminded the attorney that he had been in possession of a proposed agreement for five days which involved things other than financial matters, that they could begin to discuss those things. The attorney said in reply that he could see no point "in sitting down to piecemeal negotiations."

Gilbert also testified that at a meeting held on the evening of October 20 he informed the employes of the attitude of Acme in refusing to recognize the union, or to set a time and place for bargaining on the proposed agreement; and that thereupon they voted to call a strike for October 21. The strike was called and lasted until December 22.

On October 25 charges were filed by United with the National Labor Relations Board. Notwithstanding this, on October 29, negotiations were taken up by United with Acme for an adjustment of matters in dispute. During these negotiations Acme's attorney is said to have stated that "they were going to run an open shop and they did not care who represented the employes, but any agreement they reached would be between the employes and the company, and not with any union." Discussions were had as to terms of employment and over the details of the written agreement which United had proposed, in the course of which Acme's attorney again reminded Gilbert that the company was "signing with the employes and not with the union."

Further negotiations were had between Gilbert and the attorney for Acme on November 1 and 11 and December 3, relating to wages, hours and other matters. The parties could not reach an agreement as to increase of wages and other demands of the workers, though various concessions had been made in their favor in the course of the negotiations. But the refusal of the management to make any agreement with the union was not withdrawn. The workmen continued on strike and, on December 7, the company notified some of the strikers by registered mail to call and remove tools which they had left on the company's premises and about the same time posted a notice to the same effect on the outside door of the plant.

On November 1, in a written communication addressed to the employes, Acme reiterated the views its attorney had expressed on October 29 as to concluding any agreement with the union and said:

"We have read and considered your proposed agreement relating to wages, hours and working conditions. We state at the outset that we are always willing to negotiate with you through any representative or representatives designated by our employes, even though one or more of said representatives are representatives also of any Union, but any agreement that we make will be made with you as employes. Consequently the second paragraph of your proposed agreement" (which had been drafted by the union so as to be between Acme and Local 1223 of United) "must be redrafted so as to provide that the agreement is made between us and our employes."

On December 21, Gilbert notified Acme that United declared a truce and instructed the employes to go back to work on December 22 on the basis of a reemployment of those who should return and of an adoption of the concessions granted by the company in the course of the negotiations already had. But the company replied that any reemployment would not be pursuant to the previous negotiations, all of which had resulted in failure, and added that since concessions which had been offered had been rejected, they were withdrawn.

In addition to the foregoing evidence that Acme refused to bargain collectively with Local 1223 of United there was testimony that there were other acts of interference, restraint and coercion.

Mary Vangone, one of the employes, testified that on October 11, 1937, when the

employes in large numbers were signing union membership cards and some were on strike because of the discharge of two of them, her foreman, after she had signed her card, for the first time complained of her work, told her she was a Communist, that if she went out on strike she would have to "get * * * a rocking chair" and "twiddle her thumbs", that the girls who went out were crazy and when they came back they would get the hardest jobs and not steady work such as they had had. He told her that if she did not sign up with the union she would be given an increase. She asked the foreman to fix the machine that she was working on, which was out of order, and he told her to get the union to fix it. This employe signed the union membership application on October 11.

Anna Vangone, a sister of the above employe, testified that on October 11, one of the Acme officers interfered with her going out at the lunch hour to see the strike that was going on as to the discharge of two employes. Her forelady told her not to sign up with the union and that those who did would get harder work and would not work steadily, while she would get steady work, better jobs and more money. After she signed the card on October 11 she said the foreman nagged her about her work and called her a Communist.

Anne Burbulak, another employe, likewise testified that the forelady told the girls not to "sign up with the union, that the boss will not recognize the union, and that he would rather go out of business than sign up * * *", also that "if she catches anyone signing the white card she is going to fire them". This employe signed her card on October 11.

Florence Carlson, a fourth employe, also testified that the forelady said that it would be better for the girls not to join those who were out at the picket line, that she would get any raise they would get, would be given a better job than they, and would receive protection if there was violence. This employe signed the card on October 12.

We have outlined the evidence introduced on behalf of the petitioner Labor Board in order (1) to show refusal by Acme both to recognize Local 1223 of United as exclusive bargaining representative and to bargain collectively with it; (2) to show interference, restraint and coercion of the employes by their employer.

The respondent called witnesses who told a somewhat different story and in general denied the alleged acts of interference though some of them went far enough to concede having told employes nothing was to be gained by joining the union.

■ There plainly was substantial evidence of refusal to recognize United or to bargain with it collectively and of interference, restraint and coercion of Acme's employes.

■ The Board made findings to that effect and it cannot be doubted that the acts found would constitute unfair labor practices under Section 8(1) and (5) of the National Labor Relations Act, 29 U.S. C.A. § 158(1, 8), and violations of rights of self-organization and collective bargaining guaranteed to the employes under Section 7, 29 U.S.C.A. § 157. Art Metals Const. Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148, 150, 151.

■■ It is argued on behalf of Acme that it did bargain collectively with United because it had dealings with it as to matters in dispute, but the Act, in our opinion, requires more than that the chosen bargaining representative should be recognized as a messenger. United was a fully accredited agent with whom all contracts were to be made so long as its authority endured and it was entitled to be treated as such. Persistence by Acme in refusal to recognize the union even down to the end was illustrated by the abrupt reply of Acme's lawyer to Gilbert's letter of December 20, 1937, calling off the strike, followed by negotiations of Acme with its employes over reinstatement. M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432. To permit the employer to go behind the chosen bargaining agent and negotiate with the employes individually, or with their committees, in spite of the fact that they had not revoked the agent's authority, would result in nothing but disarrangement of the mechanism for negotiation created by the Act, disparagement of the services of the union, whether good or bad, and acute, if not endless, friction, which it is the avowed purpose of the Act to avoid or mitigate. There was substantial evidence that disregard of the union and refusal to bargain with it brought about the strike of October 20, 1937, as the Board found. The persistent refusal to treat United as an exclusive bargaining agent with power to contract and with a

right to conclude an agreement in writing to which it should be a party was a matter of serious aggravation which might well have brought about the strike.

Upon the record there was sufficient basis for the findings of fact we have mentioned and also for the conclusions of law by the Board that Acme had engaged in unfair labor practices within the meaning of Section 8(5) by refusing, on October 12, 1937, and thereafter, to bargain collectively with United as the exclusive representative of the employes, and within the meaning of Section 8(1) by interfering with the exercise of the rights guaranteed its employes in Section 7.

The tentative discussions between Gilbert and the representatives of Acme involved no recognition of United as collective bargaining agent and came to nothing definite. As a result of the futile haggling, United, on December 21, 1937, voted to terminate the strike and to proceed with its charges before the Board.

About the middle of December Acme, believing that the morale of the strikers had weakened, sent telegrams to some of the employes to come back to work and, by December 21, twenty-five of the strikers had returned and were accepted by Acme. But others who had returned on December 22, in response to the instructions of Gilbert to go to work then, apparently found the plant closed. On December 22 a committee of employes met with the company's superintendent Longstreet and requested reinstatement of all employes who had not been taken back. He said he would take them back as soon as the work was ready. Thereupon picketing was resumed upon the claim that it was a protest against a lockout. But, by January 10, 1938, approximately forty-three of the strikers had been reinstated and the picket lines were again withdrawn. Between January 10th and 15th Anna Vangone, Mary Vangone, Florence Carlson, Anne Burbulak, Amelia Watson, Christina Colella, Helen Garfinkel and Genevieve Zilinski made application for reinstatement but none of the eight had been reinstated by March 15 when the hearing in this proceeding was closed nor had any attempt been made by Acme to open the hearing to show subsequent reinstatement or justification for refusal to reinstate. While Acme asserts in its brief that four of these workers were offered employment in February, 1938, and came back in March; that a fifth returned in July, 1938; that

a sixth declined reemployment because of poor health; that the seventh (Garfinkel) was offered reemployment and declined it, and that the eighth obtained employment elsewhere, no evidence in support of these assertions appears in the record. There was evidence and much argument about the case of Helen Garfinkel who had a job as a packer that occupied but a part of her time. The remainder of her work was in preparing and serving lunches for other employes. That was a job permitted by the company but one in which she was hired and paid by the employes, and not by Acme. Her work for the latter apparently occupied only half of her time.

The Board ordered reinstatement of all eight employes with back pay. The proof in the record indicates that the order was justified, under Section 10(c) of the Act, 29 U.S.C.A. § 160(c), at the time it was made. If subsequent or unproved events furnish a defense in whole or in part to the enforcement of the foregoing provisions of the order for reinstatement and back pay, such a defense cannot affect the validity of the order itself, which speaks as of the time of the hearing and is founded upon the record before the Board. Such defenses as are asserted in Acme's brief may be interposed to a motion by the Board to punish a refusal to obey an order of this court to enforce the Board's order for reinstatement and back pay of the eight employes. We should add that Helen Garfinkel would in any event only be entitled to reinstatement and back pay for such services as she was rendering to the company prior to the strike of October 21, 1937, or their equivalent, and that she should not be allowed loss of compensation for serving lunches to employes.

It is contended in Acme's brief that we now ought to deal with the question of performance of the decree, as was done in National Labor Relations Board v. Yale & Towne Mfg. Co., 2 Cir., 114 F.2d 376, 379. But there affidavits that the employes had been reinstated were submitted and finally a consent on the part of the employer and the Board to an enforcement order which recited that the employes whose rights were in question had been reinstated and given the back pay to which they were entitled, rendered all questions of performance moot. Furthermore, in that case the employer had made a motion "to reopen the record to adduce evidence as to matters occurring subsequent to the hearings",

which was denied, whereas here Acme took no such steps. In addition to this, in the case at bar, there are unsettled questions as to the amount of back pay due the eight employes which must be determined by proof to be submitted in connection with a contempt motion, unless they are adjusted by the parties.

The Board found that Acme's delay in reinstating five other strikers, to wit: Kostiv, Racaniello, Crawford, Sobitus and Olesko, was discriminatory because the company began hiring new employes for work which the five were capable of performing instead of first taking them back. The objections of the respondent to the order for the back pay of these workers are met by the finding of the Board that "each of these five * * * could have been reinstated at an earlier date, had the respondent not given preference, in each case, to an outsider."

We hold that there was substantial evidence in support of the Board's finding that Acme engaged in unfair labor practices within Section 8(3) of the Act in 'discriminating in regard to the hire and tenure of employment of the thirteen employes mentioned above and that its directions to reinstate them and give them back pay contained in 2(b) and (c) of its order should be enforced.

The Board further ordered Acme to cease and desist from refusing to bargain collectively with United as the exclusive representative of all its employes and also upon request to bargain collectively with United as such representative and, in the event an agreement is reached, to accept United as a contracting party and signatory thereof.

Acme in answer to the petition of the Board for enforcement of its order, alleged that enforcement should be denied because the order was not based upon substantial evidence. This allegation we have already held unfounded. The record, however, leaves us in doubt whether Local 1223 was on the date of the Board's order the authorized collective bargaining agent of Acme's employes. The application cards signed by the employes limited the right of Local 1223 to act as bargaining agent to one year, which expired October 25, 1938. Where an employe has put an express time limitation on his collective bargaining agent, we do not think that the agent's authority can be presumed to continue longer. Further proof of the agent's authority should be had before we enter an affirmative order directing the employer to bargain with such agent. See National Labor Relations Board v. National Licorice Co., 2 Cir., 104 F.2d 655, affirmed 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; National Labor Relations Board v. American Mfg. Co., 2 Cir., 106 F.2d 61, 69; Stewart Die Casting Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 849, 858. Moreover, Acme's answer to the Board's petition for enforcement alleged United Local 1223 was no longer in existence and, prior to the institution of the present proceeding, the Board had arbitrarily requested that Acme bargain with another local of United, designated as Local 475, and had submitted to Acme's attorney a proposed enforcement decree (of which a copy is attached to the answer) to that effect. That decree differed in terms from the order of the Board only by the substitution of Local 475 for Local 1223. It was stated by Acme's attorney in a letter to the Board sent during negotiations for the entry of a consent decree that his "real bone of contention" with the Board was the provision that Acme recognize Local 475 as exclusive bargaining agent.

We cannot know whether Local 475 is simply another name for Local 1223, or is an entirely different union, or whether, if Local 1223 is not defunct, its authority, which was limited originally, has in fact terminated prior to the Board's order. We accordingly hold that the questions whether Local 475 or Local 1223 is the union which represents the employes, or whether neither union represents them, should be remitted to the Board so that it may determine the matter and make such order as shall be appropriate in the premises. This determination may be reached by taking testimony, or by holding an election.

The Board is directed to determine who, if any one, is at present the lawful bargaining agent of the Acme employes and to make such order as may be appropriate in the premises. Enforcement of the provisions of the order of the Board is now granted except those contained in 1(a), 2(a) and 2(e).

2(e) is modified as follows and enforcement thereof granted:

(e) Immediately post notices in conspicuous places in its plant and maintain such notices for a period of at least sixty (60) consecutive days, stating that the respondent will not engage in the practices

from which it is ordered to cease and desist in paragraphs 1(b) and (c).

██ Before entering a final decree either affirming, modifying or setting aside paragraphs 1(a), 2(a) and 2(e) (2) of the order of the Board the portions of the order relating to bargaining collectively with Local No. 1223 should be remanded to the Board for further proceedings. When the Board shall issue an order as a result of such proceedings such order shall be made a supplemental part of the pending record for our final action and decree. National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 111 F.2d 681, 690; Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 372, 373, 59 S.Ct. 301, 83 L.Ed. 221.

An enforcement order may enter in accordance with the foregoing.

CLARK, J., dissenting in part with memorandum.

CLARK, Circuit Judge (dissenting in part).

I think full enforcement of the Board's order should be had now. Overthrow of the Board's finding that Local 1223 represents a majority of the workers cannot be based on anything of record before the Board. It really rests upon assertions—assailed by the Board—which are contained in petitioner's brief and an "Answer" filed in this court, and which concern actions and concessions made by the parties purely as a basis for negotiations for settlement after the Board's decision. Certainly the fact that the union's "Application for Membership" provided that it should be "for a period of one year" is not enough to upset the well settled presumption that "the freely established majority continues until the Board has an opportunity to make its decision," that "any other rule would make a merry-go-round of the Act." International Ass'n, etc., v. National Labor Relations Board, 71 App.D.C. 175, 110 F.2d 29, 33, affirmed 311 U.S. 72, 61 S.Ct. 83, 89, 85 L.Ed. ——; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 339, 340, 60 S.Ct. 918, 929, 84 L.Ed.

1226. The provision obviously represents an attempt by the union to give greater stability to its position. In appearance the provision does so, though actually a worker can still withdraw his designation at will. In any event, so far as it goes, it is a grant, not a withdrawal, of power. Here the trial examiner's intermediate report was filed and served well within the year, and the Board's order was some three months after the year's close; though I doubt if these dates are important. To hold that an interparty regulation of the union designed to give it greater authority affords an excuse to the employer for evasion or at least lengthy contest of his obligations under the law seems to me decidedly anomalous.

Very rarely have we yielded to demands for modification of an order of the Board for asserted change of circumstance not before the Board; and I believe experience shows sounder practice to be against such yielding. For it invites vociferous pressure in all other cases; it leads to controversies on facts which we are not in a position to settle promptly and effectively; it puts a premium on delay and encourages violation of the law, for both these may thus operate to the union's prejudice and at least afford ground for renewed legal battles; and, as is here demonstrated, it makes negotiations for peaceful settlement most hazardous. Judicial action should not depend on the violence of asseveration by counsel; we have enforced orders after greater lapse of time and under circumstances more appealing than are here presented. Compare, e. g., National Labor Relations Board v. Eastern Footwear Corp., 2 Cir., 112 F.2d 716; Art Metals Const. Co. v. National Labor Relations Board, 2 Cir., 110 F.2d 148; National Labor Relations Board v. Dahlstrom Metallic Door Co., 2 Cir., 112 F.2d 756.[1] Lastly, the practice violates the basic concept of the Labor Act, for it transfers the final, and perhaps most important, exercise of discretion—that of protecting a freedom of choice once made by the workers—from the Board to the courts; it is an issue I had thought Justice Douglas put finally at rest for a unanimous Court in Interna-

---

[1] In National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 359, 60 S.Ct. 569, 84 L.Ed. 799, the Court expressly noted that the Board had not complained of the direction for an election; and American Mfg. Co. v. National Labor Relations Board, 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988, rests on the same basis. As pointed out in the opinion herewith, an application to reopen had been made to the Board in National Labor Relations Board v. Yale & Towne Mfg. Co., 2 Cir., 114 F.2d 376, 379.

424

tional Ass'n etc., v. National Labor Relations Board, November 12, 1940, 311 U.S. 72, 61 S.Ct. 83, 89, 85 L.Ed. ——.