## GREAT SOUTHERN TRUCKING CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 4874.

Circuit Court of Appeals, Fourth Circuit.

April 13, 1942.

Whiteford S. Blakeney, of Charlotte, N. C. (Guthrie, Pierce & Blakeney, of Charlotte, N. C., and Milam, McIlvaine & Milam, of Jacksonville, Fla., on the brief), for petitioner.

A. Norman Somers, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, David Findling and Ralph Winkler, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before the Court upon petition of the Great Southern Trucking Company (hereinafter called Southern), to review and set aside an order issued by the National Labor Relations Board (hereinafter called the Board), pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. The Board, in its answer to the petition, has requested that its order be enforced as issued.

The record in this case, as will later be indicated, discloses not a few inconsistencies in the testimony of some of the witnesses. There were, also, some sharp conflicts be-

tween the testimony of witnesses for Southern and the testimony of witnesses for the Union. We think, however, that there was substantial evidence in the record to support the outline, which we now set out, of the important facts in the instant controversy.

Southern, a Florida corporation with its principal office in Jacksonville, Florida, is engaged in the business of hauling freight by motor trucks. In connection with its operations, Southern maintains offices and warehouses in the States of Florida, Georgia, Tennessee and North Carolina, including a terminal in Charlotte, North Carolina, where the alleged unfair labor practices occurred. In October, 1938, Local No. 71 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America (hereinafter referred to as the Union), began a campaign to unionize Southern's employees at the Charlotte, North Carolina, terminal. During the critical period of the membership drive, Southern attempted to defeat the organizational movement both by discrediting the Union leaders and disparaging the advantages of Unionization, and also by instigating a counter-movement among the employees for the formation of an unaffiliated union.

Southern's efforts, however, were unavailing, and by April, 1939, the Union included in its membership well over a majority of Southern's employees in an appropriate unit. Accordingly, the Union initiated collective bargaining negotiations with Southern on April 4, 1939, when Secretary Fullerton of the Union wrote to President Raulerson of Southern at the company's main office in Jacksonville, Florida, enclosing a proposed agreement and requesting a bargaining conference. Raulerson replied that the proposed contract, " * * * offers little in the way of a basis for negotiations in that it is impossible to exist under it. I am, however, referring the same to our Charlotte attorney, Mr. Blakeney, * * * and to our Superintendent in that territory, Mr. J. R. Mathews, who will be glad to go over the matter with you. * * * I have been practically out with an unenjoyable case of flu for three weeks, and for these reasons ask that you first take this matter up with the above named gentlemen. *I shall be glad to come to Charlotte when the same is necessary."* (Italics ours).

The first collective bargaining conference was held in Charlotte on May 6, 1939. At this meeting, the conferees discussed the Union's demands for wage increases, paid vacations, a closed shop and straight seniority. Raulerson, however, had not granted authority to Mathews, Southern's representative, to conclude a binding agreement on Southern's behalf, so that the conferees, in effect, were "just talking it over". This meeting ended with the understanding that Southern's representatives would consult with Raulerson concerning certain aspects of the discussion regarding wage increases and that the conferees would thereafter meet at a then undetermined date.

On June 5, 1939, Raulerson came to Charlotte, but he made no effort whatever to arrange a formal conference with the representatives of the Union. Instead, Southern, shortly thereafter, posted a notice on its bulletin boards thereby advising the employees *directly* that it was granting them a week's vacation with pay each year. It is noteworthy that such a vacation plan had been included in the Union's original proposed agreement of April 4, 1939, and had also been discussed in the bargaining conference of May 6, 1939. Yet Southern neither advised the Union of the grant before it became effective nor did Southern credit the Union with having had any part in obtaining this concession.

Formal negotiations between the Union's bargaining committee and the representatives of Southern were resumed on June 24, 1939. During this conference it became quite evident that while Garrett, who had replaced Mathews, had "quite a bit more authority" than his predecessor, Garrett, too, lacked the final power to bind Southern by any contract with the Union. Some of the Union committeemen thereupon stated that it was a "waste of time" to continue negotiations with representatives who lacked such authority. The Union representatives, therefore, asked that Raulerson come to Charlotte to negotiate with them in person. Garrett, however, persuasively suggested to the Union committeemen that the meeting continue in order that certain of the disputed provisions of the agreement might be sifted down and ironed out.

While many of the Union's demands met the approval of Garrett at this meeting, it seems to have been distinctly understood then, that Garret would submit the proposals to Raulerson "for the latter's consideration and approval if he saw fit". Garrett also assured the Union that he would do his utmost to prevail upon Raulerson to accept them.

Apparently Southern had for three years promised the employees wage increases without taking any affirmative steps to fulfil this promise. To the Union's insistence that this matter be satisfactorily settled, Garrett suggested that the question be deferred, since he believed there would be "no difficulty in arriving at an adjustment of pay".

A report to Raulerson of the results accomplished by Garrett (at the second bargaining meeting) with an inquiry as to whether Garrett should bring the proposals to Raulerson in Florida, brought a reply stating that Raulerson would be in Charlotte shortly. Fullerton, on learning of this fact, requested Garrett to arrange a conference between Raulerson and the Union. Garrett agreed to do so. A few days later, on July 20, 1939, Raulerson came to Charlotte and discussed the Union's proposals privately with his attorney, Blakeney, and Garrett. Here again, Raulerson made no effort to meet with the representatives of the Union. On the contrary, two days later, on July 22, 1939, Southern, without prior consultation with, or communication to, the Union, posted a notice in the Charlotte terminal advising the employees *directly* of a new wage scale with substantial wage increases for all employees. This unilateral tactical action was similar to the procedure previously followed by Southern with respect to paid vacations, in that no mention whatever was made in the posted notice (or otherwise) of the Union's overtures on behalf of the employees concerning the wage increases.

The third and final bargaining conference was held on July 29, 1939, pursuant to a request from Fullerton. Blakeney asked the representatives of the Union whether or not negotiations should be considered at an end in view of Raulerson's definite refusal to agree to several of the Union's most important proposals. The Union committee replied that it did not regard the negotiations as ended and that it still desired Raulerson to come to Charlotte, so that it could bargain directly and personally with him in the hope that the Union might then persuade him to accept its proposals. Blakeney thereupon stated that there was no purpose in Raulerson's coming to Charlotte in view of the apparent impasse with regard to a closed shop and straight seniority since Blakeney believed Raulerson would remain adamant in his refusal to accept the Union's demands on these two points. The conference ended with the understanding that Blakeney would request Raulerson for a *written statement* of Raulerson's position.

On August 16, 1939, Raulerson wrote to Blakeney stating that he was *unwilling* to agree to the closed shop and seniority clauses but that he " * * * was willing to negotiate with the (Union) relative to the terms of the contract which they have proposed and if they desire, I will make arrangements to come to Charlotte and discuss the matter with them". Shortly thereafter, Fullerton told Blakeney that unless Raulerson came to Charlotte, Fullerton would not be responsible for the actions of the employees.

About this time, the employees held a meeting to discuss "definite action regarding getting Mr. Raulerson up here". Then on August 31, 1939, McCrorie, business agent of the Union, approached Garrett and demanded that Raulerson be in Charlotte not later than September 2, 1939, to negotiate with the Union. Garrett protested that this request was unreasonable in view of the shortness of time, so McCrorie extended the date to 6 P. M. on September 6th. On August 31, Garrett telephoned Raulerson at Atlanta, Georgia, and related his discussion with McCrorie. Raulerson stated that he would be unable to be in Charlotte on the 6th of September, since he expected important litigation in which he was involved in Jacksonville to come on for trial on September 5th. Yet Raulerson admitted at the hearing that while he could have come to Charlotte during the period between August 31 and September 6, he made no effort to do so.

On September 2, 1939, all of the employees who were members of the Union unanimously voted to go out on strike if Raulerson did not appear in Charlotte by six P. M. on September 6, 1939. On September 5, Garrett notified McCrorie that he had communicated with Raulerson and that Raulerson stated he was involved in a court proceeding which was pending in Jacksonville but that he would definitely be in Charlotte on September 9, or preferably on the 11th, to discuss the contract with the Union. McCrorie reiterated that September 6 at 6 P. M. was the "deadline". Garrett immediately attempted to report the Union's final decision to Raulerson but was unable to do so until the morning of September 6. At this time, Raulerson's court proceeding had been postponed to September 11 and he admittedly could have left Jacksonville for Charlotte that day. However, he made no effort to

do so but asked Garrett to notify the Union that he definitely would be in Charlotte on September 13 to negotiate with it. This message was communicated to the Union prior to 1 P. M. on September 6.

At 6 P. M. on September 6, 36 employees at Southern's Charlotte terminal went out on strike for the purpose, as many of them testified, "of inducing Raulerson to come to Charlotte to negotiate with the Union". Three employees at the High Point terminal of Southern, on September 9, struck in sympathy. Garrett requested the men to complete their work but they refused to do so. And despite the strike, Raulerson still made no effort to visit Charlotte immediately.

Between 6 P. M. on September 6 and the afternoon of September 8, Southern had replaced all but one of the striking employees and had resumed normal operations. Southern then posted on its bulletin board and sent to each striker the following notice: "To all men who have left their jobs and gone out on strike, you are hereby notified that you are discharged."

On September 8 and 9, at the request of an agent of the National Labor Relations Board, conferences were held between representatives of the Union and Southern in an effort to settle the strike. The Union agreed to allow the employees to return to work upon the assurance that Raulerson would come to Charlotte to engage in collective bargaining. This proposal was communicated to, and rejected by, Raulerson who stated that he preferred to maintain the status quo until he reached Charlotte on September 13. On this date, representatives of the Union and agents of the Board met with Raulerson and Garrett. As the meeting opened, Raulerson read the following prepared statement:

"The management of the Great Southern Trucking Company has dealt with its employees in the utmost fairness and good faith. In its relations and dealings with its employees, the Company has done even more than the reasonableness required.

"Despite this, a considerable number of men saw fit to quit their jobs and go out on strike last Wednesday, September 6. If the Company was to stay in business and if its operations were to go on, it was necessary that new men be hired to replace those who had quit their jobs. We have replaced the men who have left their jobs and at the present time, the Company does not have any jobs open.

"If any of the men who left their work and went out on strike now or hereafter desire to go back to work for the Great Southern Trucking Company, we will be glad to consider their applications if and when vacancies occur, and we will do so impartially and without discrimination against the men who have gone out on strike and without being influenced by the fact that they belong to the union.

"Our information is that the Union does not claim to represent a majority of the men who have replaced those who went out on strike. This being true, it is our understanding that we are not required, nor indeed permitted, by law to engage in collective bargaining at the present time."

Immediately after the reading of this statement, an agent of the Board asked Raulerson to "sit down and discuss the situation with the representatives of the Union". Raulerson replied, "I stand on the statement I have just read". He then left the meeting immediately. No further attempts were subsequently made by either the Union or Southern to renew negotiations.

It is noteworthy that during the entire period of the negotiations and the ensuing strike, there is substantial evidence that supervisory employees of petitioner engaged in anti-union conduct. The following statements are illustrative: That Raulerson "would quit the business" rather than accept the Union, that Raulerson "would retire with a million dollars" rather than recognize the Union which was "more or less a racket"; that the employees should "string along" with Southern and not "mess" with the Union. Finally, there were thinly veiled promises of better jobs for those who would withdraw from the Union.

Upon the foregoing facts, the Board concluded that Southern, (1) in violation of Section 8(5) of the National Labor Relations Act, had refused to bargain collectively in good faith with the Union; (2) in violation of Section 8(3) of the Act, had discriminatorily discharged 40 employees because they had engaged in a strike caused by Southern's illegal refusal to bargain; and (3) thereby, as well as by acts and statements evincing hostility to the Union and designed to discourage membership in it, had, in violation of Section 8(1) of the Act, interfered with, restrained, and coerced its employees in the exercise

of the rights guaranteed them in Section 7 of the Act.

Accordingly, the Board issued an order directing Southern to cease and desist from its unfair labor practices, to offer reinstatement with back pay to the employees discriminated against, to bargain with the Union upon request, and to post appropriate notices. Two questions are presented for our consideration; namely, (1) whether the Board's findings of fact that Southern has violated Sections 8(1), (3) and (5) of the Act are supported by substantial evidence, and (2) whether the Board's order is valid and proper under the Act.

■ It is elementary that the National Labor Relations Act does not compel an employer to seek out his employees or request their participation in negotiations for purposes of collective bargaining. N. L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660. Nor was Southern under any legal obligation to bargain solely through its President, Raulerson, or through any particular officer of the employer-corporation which the representatives of the Union might choose. N.L.R.B. v. Hopwood Refining Co., 2 Cir., 98 F.2d 97, 101. Nor is there any duty on the part of the employer to be represented in the bargaining negotiations by a person or persons with competent authority to enter into a binding agreement with the employees; but the character and powers of the person designated by the employer as the negotiating agent is yet a factor which should be taken into consideration in order to decide whether the employer's effort to negotiate was really made in good faith. See N.L.R.B. v. Hopwood Refining Co., supra, and see National Licorice Co. v. N. L.R.B., 309 U.S. 350, 354, note 1, 60 S.Ct. 569, 84 L.Ed. 799. And an employer not guilty of conduct denounced by the Act has the right to protect and continue its business by employing new men for jobs left by strikers so that an employer would not later be bound to displace men hired to take the strikers' places in order to provide positions for the strikers. N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

The crux of the instant case, however, seems to be whether or not the strike which occurred on September 6, 1939, was a labor dispute caused by the unfair labor practices of Southern. This, in large measure, depends on the answer to another question: at what stage of the collective bargaining procedure did the Union take the definite stand that the presence of Raulerson was indispensable to the negotiations. Southern contends that the Union first manifested this position six days before the strike was called. This is based on the testimony of Southern's bargaining representative Garrett, to the effect that: "The first demand ever made on me to have Mr. Raulerson up here to bargain, or for any purpose, was on August 31st."

The Union's position to the contrary is that Raulerson utilized "every possible method to avoid bargaining" with it and that Raulerson had flouted, directly or otherwise, long prior to August 31st, all of its requests made that he confer formally with it. So testified Fullerton, bargaining agent of the Union, and so, among others, testified Union Committeeman Houston, whose testimony in this respect was accepted by both the Trial Examiner and the Board.

■ Unfortunately, the record in this case is replete with these and other inconsistencies and conflicts in the testimony. Nevertheless, we feel that the Board's resolution of the conflicting and inconsistent testimony in its entirety was supported by substantial evidence. We, therefore, find that the Board was justified in finding that Southern entertained no genuine purpose or honest desire to reach an agreement with the Union and, accordingly, was guilty of an unfair labor practice in failing to bargain collectively with the Union in good faith.

■ An employer may not have a mind "hermetically sealed" against the acceptance of the proper procedure of collective bargaining in good faith; nor may an employer engage in such Fabian tactics as will practically render abortive the statutory rights of the employees. Thus, it is not without note that Raulerson, the only person who had authority on behalf of Southern to render the conferences anything more than a mere exchange of ideas, never attended any of the meetings with the Union's representatives. Yet he had ample opportunity to do so before and even during the critical period of August 31 to September 6. But not once during the entire course of negotiation was the Union afforded an opportunity to confer with, or to convince, anyone having authority to

agree to anything on behalf of Southern concerning the merits of the Union's proposals.

◼ Similarly, Southern's action regarding wage and paid vacation concessions, two of the most important elements of the employer-employee relationship, without prior agreement thereon by the Union and while negotiations were still in progress, constituted an obvious attempt to settle unilaterally matters with respect to which Southern was under a statutory duty to deal with the Union. Such conduct itself constitutes a violation of Section 8(5) of the Act. Singer Mfg. Co. v. N.L.R.B., 7 Cir., 119 F.2d 131, 137, 138, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; Inland Lime & Stone Co. v. N.L.R.B., 7 Cir., 119 F.2d 20, 22; N.L.R.B. v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 478, 479; Wilson & Co., Inc., v. N.L.R.B., 8 Cir., 115 F.2d 759, 763; N.L.R.B. v. Acme Air Appliance Co., 2 Cir., 117 F.2d 417, 420; N.L.R.B. v. George P. Pilling Co., 3 Cir., 119 F.2d 32, 36, 38.

◼ Southern's hostility to the Union, manifested by its initial efforts to defeat the Union's organizational drive through the instigation of a counter movement for an unaffiliated union; the anti-union statements and threats of its supervisory employees; its continued campaign during the period of the negotiations to induce withdrawals from the Union; and Raulerson's refusal to submit himself to the "give and take of personal conferences"; and, indeed, the "whole congeries of facts" disclosed by the record, all further reveal a determined course of deliberate non-compliance with the Act from which an inference of bad faith could reasonably be drawn. Solvay Process Co. v. N.L.R.B., 5 Cir., 117 F.2d 83, 86, certiorari denied 313 U.S. 596, 61 S.Ct. 1121, 85 L.Ed. 1549; N.L.R.B. v. P. Lorillard Co., 6 Cir., 117 F.2d 921, 924, certiorari granted on another point 313 U.S. 557, 61 S.Ct. 1115, 85 L.Ed. 1518.

The insistence of the employees that Raulerson come to Charlotte, therefore, was really an attempt by these employees to secure assurance that Southern's illegal bargaining tactics would cease. His failure to appear before the deadline of 6 P. M. on September 6 set by the Union may be deemed the denouement of a whole background of anti-union conduct. This conclusion of the Board that the setting of a deadline by the Union was not an unreasonable or unconscionable ultimatum which would absolve Southern from fault in the cause of the strike, was reached in the light of the cumulative effect of Southern's prior tainted labor policy.

A number of the Union representatives testified that Raulerson's failure to come to Charlotte by the time fixed in the Union's ultimatum was the cause of the strike. The Board interpreted this to mean (with substantial evidence to support that interpretation) not that this fact, isolated and alone, solely caused the strike, but, rather that this was merely the last straw that broke the back of the labor camel, in the nature of a final, efficient cause. The real, motivating cause of the strike is found in the whole sequence of events, in which Raulerson's refusal to come to Charlotte before the deadline was merely the culmination and climax.

◼ Accordingly, there was substantial evidence to support the finding by the Board that Southern's illegal practices were responsible for the strike. Cf. Republic Steel Corp. v. N.L.R.B., 3 Cir., 107 F.2d 472, 478, certiorari denied on this point 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1027; N.L.R.B. v. Remington Rand, 2 Cir., 94 F.2d 862, 871, 872, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; N.L.R.B. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 175, 176, certiorari denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506. It follows that the discharge of the strikers, under these circumstances, constituted as a matter of law a direct violation of Section 8(1) and (3) of the Act. See N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 347, 58 S.Ct. 904, 82 L.Ed. 1381; Jeffery-DeWitt Insulator Co. v. N.L.R.B., 4 Cir., 91 F.2d 134, 138, 139, 112 A.L.R. 948, certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565; El Paso Electric Co. v. N.L.R.B., 5 Cir., 119 F.2d 581; N.L.R.B. v. Gulf Public Service Co., 5 Cir., 116 F.2d 852; N.L.R.B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 866, 870, 871, certiorari denied, 304 U.S. 576, 585, 58 S.Ct. 1046, 82 L.Ed. 1540; Black Diamond S. S. Corp. v. N.L.R.B., 2 Cir., 94 F.2d 875, 878, 879, certiorari denied 304 U.S. 579, 58 S.Ct. 1044, 82 L.Ed. 1542; Union Drawn Steel Co. et al. v. N.L.R.B., 3 Cir., 109 F.2d 587, 589, 591, 592; Mooresville Cotton Mills v. N.L.R.B., 4 Cir., 94 F.2d 61, 65; N.L.R.B. v. Good Coal Co., 6 Cir., 110 F.2d 501, 503, certiorari denied

310 U.S. 630, 60 S.Ct. 978, 84 L.Ed. 1400; N.L.R.B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 792, certiorari denied 312 U.S. 713, 61 S.Ct. 619, 85 L.Ed. 1144.

We likewise believe there was substantial evidence to support the finding of the Board that Southern, in its attempts to discourage membership in the Union and in the action of the supervisory employees of Southern, who made disparaging remarks about the Union and its leaders, has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed them in Section 7 of the Act.

In conclusion, we are of the opinion that the Board's findings of fact that Southern has violated Sections 8(1), (3) and (5) of the Act are supported by substantial evidence; and that the Board's order in the light of these findings, is valid under the Act and should be enforced as issued.

Affirmed and order enforced.