## NATIONAL LABOR RELATIONS BOARD v. HIGHLAND SHOE, Inc.

### No. 3625.

Circuit Court of Appeals, First Circuit.

April 15, 1941.

Edward Schneider, Regional Atty., of Boston, Mass. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Samuel Edes and Walter B. Wilbur, all of Washington, D. C., on the brief), for the Board.

David V. Berman, of Lewiston, Me. (Berman & Berman, of Lewiston, Me., on the brief), for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is a petition by the National Labor Relations Board under § 10(e) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., for the enforcement of an order[1] directing the respondent, upon

---

[1] "Upon the basis of the above findings of fact and conclusions of law, and pursuant to section 10(c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Highland Shoe, Inc., Lewiston, Maine, and its officers, agents, successors, and assigns shall:

"1. Cease and desist from:

"(a) Refusing to bargain collectively with United Shoe Workers of America

request, to bargain collectively with the United Shoe Workers of America as the exclusive bargaining representative of its production employees. All facts necessary to sustain the jurisdiction of this court are admitted.

In proceedings duly had under § 10(b) of the Act, the Board found that the respondent, a Maine corporation having a factory in Lewiston in that State, was, in 1937 and prior thereto, engaged in the business of manufacturing women's novelty shoes. In March, 1937, a general strike of shoe workers occurred in Lewiston and the adjoining city of Auburn which affected the respondent and caused it to suspend operations. On May 15, 1937, while this strike was still in progress, a consent election, under the supervision of the Regional Director and a conciliator of the United States Department of Labor, was held for the purpose of determining the bagaining representative of the respondent's employees. In this election only production employees were permitted to vote, that is, foremen, assistant foremen, office help and salesmen were excluded from it. The Board finds that this election was fairly conducted and that it accurately reflected the will of the participating employees. A substantial majority of the employees entitled to vote selected the United Shoe Workers of America as their bargaining representative. The respondent admits the foregoing facts, and it also admits that the employees who were allowed to vote constituted an appropriate unit for the purpose of collective bargaining and that the United Shoe Workers of America was then

and still is a labor organization within the meaning of § 2(5) of the Act.

On June 12, 1937, the respondent and the Union entered into a closed shop contract, the salient provisions of which, so far as material to the issues raised by this petition, were that there should be a 10 per cent increase in wages to take effect on June 16, 1937, and a further 5 per cent increase in wages to take effect on November 1, 1937; that "no worker or group of workers shall have the right to modify or waive any of the provisions of this Agreement"; and that "This contract shall remain in force until June 16, 1938 but in event of a strike or labor trouble by the Firm's Employees or the Union, then this contract shall terminate forthwith."

Following the execution of this contract the respondent resumed operation, but during the summer and fall of 1937 orders were few and business was slack. During the latter part of September one of the respondent's directors named Arissian approached a local organizer for the Union with a request for permission to reduce wages 5 per cent below the level called for by the contract. The organizer informed Arissian that he had no authority to grant such a request but suggested that the matter be taken up with the Union's Boston office. Arissian did so by letter on the following day but his request was refused. Arissian then tried once more to obtain a reduction in wages from the local organizer for the Union referred to above but was again told by the latter that he lacked authority.

---

as the exclusive representative of its employees of the Lewiston, Maine factory, exclusive of foremen, assistant foremen, office help, and salesmen;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in section 7 of the National Labor Relations Act.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Upon request, bargain collectively with United Shoe Workers of America as the exclusive representative of its employees at its Lewiston, Maine, factory,

exclusive of foremen, assistant foremen, office help, and salesmen, in respect to rates of pay, wages, hours of employment, and other conditions of employment;

"(b) Post immediately in conspicuous places at its Lewiston, Maine, factory and maintain for a period of at least sixty (60) consecutive days from the date of posting, notices to its employees, stating (1) that the respondent will not engage in the conduct from which it is ordered to cease and desist in paragraphs 1(a) and (b) of this order; and (2) that the respondent will take the affirmative action set forth in paragraph 2 (a) of this order;

"(c) Notify the Regional Director for the First Region in writing, within ten (10) days from the date of this order, what steps the respondent has taken to comply herewith."

On October 12 the respondent closed down its factory completely and did not re-open it again until after the middle of December. Since the factory was closed on November 1, the provision in the contract calling for a 5 per cent increase in wages on that date did not go into effect, and the respondent did not put it into effect when the factory was reopened as will appear hereafter.

On November 26 the respondent mailed post cards to each of the 167 employees who had actually worked for it during the week ending September 25 inviting them to meet at the factory at 2 P. M. on November 29. Approximately 70 of the respondent's employees attended this meeting. At it, the Board finds: "They were addressed by Arissian, who told them that the respondent had been unable to reopen the plant because of competitive conditions in the shoe industry; that other manufacturers had reduced wages as much as 12½ per cent; that it was impossible for the respondent to stay in business under the wage scale provided in the contract with the Union; but that if the employees accepted a ten per cent wage reduction they could have steady work." At the suggestion of one of the employees a vote was taken at this meeting on the question of returning to work with a 10 per cent reduction in wages. Of the employees present 65 voted to accept the reduction and 3 voted not to.

On November 30, 1937, the day following this meeting, Arissian, on behalf of the respondent, wrote a letter to the Boston office of the Union making what he called a "last appeal" for permission to reduce wages. On this occasion he asked for a reduction of 15 per cent. This letter was never answered in writing but on December 22, shortly after the respondent had reopened its factory, one Rogers, an attorney-at-law retained by the Union, and Mackesy, a local Union organizer, called at the respondent's factory and advised Arissian and two other directors of the respondent who were then present, that the Union, in order to allow the respondent to meet competition, had decided to consent to a 10 per cent reduction in the wage scale called for by the contract. The respondent's officials did not at once accept this offer, nor did they reject it, but they told Rogers that they would take it under advisement and inform him of their decision later. On the day following Rogers returned to the factory where he was told by Morian, the respondent's president, that his offer of the day before had, after consideration, been rejected by the directors. Morian also told Rogers that the directors wanted an answer to their letter of November 30. When Rogers replied that he was clothed with authority to discuss and close the matter of wage reductions with the respondent and that he was present in answer to the respondent's letter of that date he was told, "it doesn't make any difference, we don't want anything more to do with you".

On December 28, at about 8 o'clock in the morning, a strike occurred at the respondent's factory. The Board found that this strike could not "be ascribed to the Union or to the respondent's employees", but that it was fomented by the wife of one of the respondent's directors and the daughter of another, both of whom were production employees and unwilling members of the Union, and that it was "planned and instigated" by the respondent "in order to terminate its relations with the Union and avoid bargaining with it".

During the afternoon of the day of the strike an authorized representative of the respondent informed a Union organizer orally, the Union itself by letter, and the public generally by advertisement in the local evening newspaper, that it considered its contract with the Union terminated because of the strike and that from then on it would conduct an open shop.

On the day following the strike, Arissian told Mackesy that he would not confer or deal with the Union in any way and since then neither he nor any of the other directors have done so. On this same day Mackesy wrote a letter to the respondent in which he asked for a conference between representatives of the respondent and representatives of the Union "so that this matter may be satisfactorily straightened out". This letter was not answered and the Union made no further effort to negotiate with the respondent. The Board finds that "To have done so would have been futile, since Arissian testified that had the Union officials come to his office thereafter to discuss these matters with him, he would have 'listened to them' but 'that is all'."

On the basis of the facts briefly summarized above, the Board concluded that the respondent had refused to bargain collectively with the Union as the exclusive representative of its employees;

that the actions of the respondent throughout the period in question were such as to indicate to its employees its distaste for dealing with the Union and to discourage membership therein; that it had interfered with its employees' rights of self organization; and that by dealing with the employees directly rather than through the Union, it had discredited the Union as the exclusive bargaining agency for its employees. It therefore decided that the respondent had violated § 8(1) and (5) of the Act.

The finding of the Board that the respondent is engaged in interstate commerce and that its activities set forth above tend to cause labor disputes burdening and obstructing that commerce have not been challenged.

In its argument before us the respondent takes the position that some of the Board's findings of fact are not supported by the evidence and that certain of its conclusions of law are erroneous. More specifically, it contends that the mailing of cards by the respondent to its employees on November 26, 1937, and the meeting held in the factory on November 29 in consequence thereof, did not constitute an unfair labor practice; that the record contains no substantial evidence to support the finding by the Board that the respondent's directors instigated the walk-out of December 28; that the instigation of this walk-out, even if properly found, did not constitute an unfair labor practice under the Act but only a breach of contract; that there was no refusal on the part of the respondent to bargain collectively with the Union; and that the affirmative order of the Board to so bargain was improper because at the time of the hearing before it the Union had ceased to represent a majority of the respondent's employees.

The initial question presented is whether or not the acts of the respondent on November 26 and 29 were within the ban of § 8 of the Act. We have no doubt that they were. That section provides: "It shall be an unfair labor practice for an employer—* * * (5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [159(a) of this title]." The latter section reads: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for

the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." Clearly to bargain directly with one's employees is not to bargain with their designated exclusive representative, but the respondent contends that the evidence does not warrant the conclusion that it in fact bargained with its employees at the meeting on November 29. This position is not well taken.

While it is true that at the meeting Arissian did not directly ask the respondent's employees to accept a cut in wages, and while it is equally true that the suggestion for a vote on the question of a wage-cut came not from him but from one of the employees present, still the fact remains that the only reason why the meeting was called was so that rates of pay might be discussed between the respondent and its employees directly and in circumvention of the Union. No other reason for the meeting has been suggested or appears in the evidence; no other reason for it can be inferred. Even though the respondent refrained from directly asking its employees to take a reduction in wages it is evident that its whole purpose in calling the meeting was to induce them to do so.

To hold that the Board must accord controlling importance to the respondent's obviously studied act of restraint would be to permit it to evade the clear mandate of the Act. In addition such a holding would be tantamount not only to a denial of the power of the Board to draw inferences from the facts before it (National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 85 L.Ed. ——, decided Jan. 6, 1941), but also to a denial of the power of the Board to consider the "patent imponderables permeating the entire record". International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. ——, decided Nov. 12, 1940.

Neither is there any merit to the respondent's contention that, prior to November 29, the Union had refused to bargain with it and so created an impasse which excused the respondent from its statutory duty to bargain collectively. The basic reason why this contention cannot be sustained is that there is no evidence that up to November 29 negotiations between the Union and the respondent had broken down. All that appears is that until after

November 29 the Union had no representative in Lewiston possessing authority to bargain for it with respect to wages, although such representatives were continuously available to the respondent in Boston, and that up to that time the Union had refused to consent to any reduction in the wage scale called for by its contract of June 12. We are unable to see any legal significance in the fact that the representative of the Union authorized to bargain for it resided in Boston instead of Lewiston, and the fact that the Union refused its consent to a reduction in wages is wholly insufficient to warrant the conclusion that it refused to bargain. It only indicates that the Union refused to consent to an alteration in the terms of a bargain already made, and there can be no doubt that a Union, like any other party to a contract, is wholly within its rights in so doing. In consequence we have no hesitation in upholding the Board's conclusion that the respondent, on November 29, 1937, violated the statute by bargaining directly with its employees as to a matter which the statute describes as appropriate for collective bargaining, after they, in an appropriate unit, had made a valid selection of an exclusive bargaining representative.

■ The respondent's next contention may be briefly disposed of. Even though we assume, contrary to the Board's finding, that the strike of December 28 was not instigated by the respondent and therefore that the respondent was within its rights in treating the contract of June 12 as terminated thereby according to its terms, still the respondent's statutory duty to bargain collectively with the Union as the exclusive representative of its employees did not also come to an end. There is nothing in the Act to indicate that its framers intended that its force should be expended after it had once operated to cause an employer to bargain collectively with his employees. In our view, if Congress had intended that the duty to bargain collectively which it imposed should be limited in duration to the term of an employment contract of the sort which it contemplated the Act would encourage (National Labor Relations Board v. Sands Manufacturing Co., 306 U.S. 332, 342, 59 S.Ct. 508, 83 L.Ed. 682), it would have so provided in clear and specific terms.

Furthermore, unless the statutory duty to bargain collectively is held to remain in force even after a labor contract previously made has been broken, the purpose of the Act to promote industrial peace through collective bargaining will be attained only in small measure. Whether this duty continues after an impasse has been reached in negotiations between an employer and the representative of his employees is a point we need not consider because there is nothing in the record in the case at bar to indicate that such a point was reached in the negotiations between the Union and the respondent. Consequently the refusal of the respondent to bargain with the Union after the strike of December 28 was also a violation of § 8(5) of the Act.

■ From the facts stated in this opinion (many unfavorable to the respondent have been omitted for the sake of brevity), all of which are amply supported by the evidence, it is clear that the respondent also violated § 8(1) of the Act in that it interfered with the right of its employees to organize themselves for the purpose of collective bargaining through representatives of their own choosing. Respondent's conduct in meeting with its employees directly on November 29 instead of with their duly constituted representatives; its conduct on December 22 in refusing to recognize Rogers' authority to represent the Union but instead insisting upon a written answer to its letter of November 30; and its further conduct, after December 28, in flatly refusing to treat with any representative of the Union, must have been designed to discourage Union activity on the part of its employees and could have had no other effect.

Recent decisions of the Supreme Court of the United States provide the answer to the respondent's contention that the order of the Board should not be enforced for the reason that at the time of the hearing before it the Union had ceased to represent a majority of the respondent's production employees.

In National Labor Relations Board v. Bradford Dyeing Association, 310 U.S. 318, 339, 340, 60 S.Ct. 918, 929, 84 L.Ed. 1226, the Supreme Court directed the enforcement of an order of the Board requiring that the respondent bargain collectively with the Textile Workers Organizing Committee and reversed an order of the Circuit Court of Appeals which had vacated that order of the Board "Until a new election has taken place by order of the Board, and the employees have expressed their preference as to what group or body shall

represent them." In the above case the Supreme Court found substantial support in the evidence for the Board's finding that "had it not been for the unfair labor practices of the respondent in organizing and fostering" a labor organization in competition with T. W. O. C. and "in persuading, intimidating and coercing" its employees to join that organization "and leave the T. W. O. C., the respondent's employees would have remained members of the T. W. O. C.", and endorsed the Board's conclusion that "The unfair labor practices of the respondent cannot operate to change the bargaining representative previously selected by the untrammelled will of the majority." Accordingly the court held that the Board "was justified in its finding 'that on April 4, 1937, and at all times thereafter, the T. W. O. C., pursuant to Section 9(a) of the Act, was the exclusive representative of all the employees in the appropriate unit for purposes of collective bargaining * * *.'"

Substantially the same question was again considered by the Supreme Court in the case of International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 89, 85 L.Ed. ——, decided Nov. 12, 1940. In this case the court said with reference to proceedings under § 10 of the Act: "Where as a result of unfair labor practices a union cannot be said to represent an uncoerced majority, the Board has the power to take appropriate steps to the end that the effect of those practices will be dissipated. That necessarily involves an exercise of discretion on the part of the Board—discretion involving an expert judgment as to ways and means of protecting the freedom of choice guaranteed to the employees by the Act. It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged." The court also said: "It cannot be assumed that an unremedied refusal of an employer to bargain collectively with an appropriate labor organization has no effect on the development of collective bargaining."

■ In the case at bar the findings of the Board with respect to the effect of the respondent's unfair labor practices upon the attitude of its employees toward their Union are substantially similar to those in the Bradford Dyeing Association case, and those findings are amply supported by the evidence. Furthermore it is as apparent

here as it was in the International Association of Machinists case that the unfair labor practices of the respondent tended to undermine the prestige of the Union in the eyes of those of its members who were employed by the respondent. Consequently, in accordance with the decisions cited above, we hold that the question of what, if any, action should be taken with respect to a redetermination of the bargaining representative of the respondent's employees is one for the Board under § 9(c) of the Act and not for this court in proceedings under § 10 thereof.

Since no part of the Board's order except that which has been considered above has been questioned by the respondent, we need give that order no further consideration.

A decree will be entered enforcing the order of the Board.