## NATIONAL LABOR RELATIONS BOARD v. BLANTON CO.

### No. 506.

Circuit Court of Appeals, Eighth Circuit.

July 8, 1941.

Abraham J. Harris, of Washington, D. C., Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest

566

A. Gross, Asst. Gen. Counsel, Sylvester Garrett and Ramey Donovan, Attys., National Labor Relations Board, all of Washington, D.C., on the brief), for petitioner.

Clarence T. Case, of St. Louis, Mo. (David W. Voyles, of St. Louis, Mo., on the brief), for respondent.

Before WOODROUGH, JOHNSEN, and VAN VALKENBURGH, Circuit Judges.

JOHNSEN, Circuit Judge.

The National Labor Relations Board has filed a petition under 29 U.S.C.A. § 160(e), Act of July 5, 1935, § 10(e), for the enforcement of its order of October 31, 1939, against respondent.

In addition to its cease and desist provisions, and the usual provision for the posting of notices, the order directed respondent, upon request, to bargain collectively with United Oleomargarine Workers Local Industrial Union No. 489, affiliated with the Congress of Industrial Organizations, as the exclusive representative of its production and maintenance employees; to reduce to writing and sign any agreement that might be reached; and to reinstate seven named employees, with back pay, less any interim net earnings, from the date they had been denied reemployment, on the termination of a strike in July, 1937.

Respondent, a Missouri corporation, with a plant at St. Louis, having at the time about 106 employees, was engaged in manufacturing and processing oleomargarine, food shortening, mayonnaise, and other vegetable products. The interstate character of its business was admitted.

In May 1937, a C. I. O. organizer began efforts to unionize respondent's plant. A meeting to organize the union was called for the night of June 1, 1937. The employer, hearing of the activity, called a meeting of all plant employees at the close of work on that day. Blanton, the president, who controlled the corporation, read to the employees a statement, in which he declared, among other things, that "if we are not treating our labor fair and reasonable then we want to know it"; that "we have no objection to any of our employees joining a union and paying their union dues as long as they see fit", but that "when you join a union and you want to work on a union basis, then you lose your position working under our profit-sharing arrangement"; that "this means we will not guarantee any regular employment and in time of depression there will be no security of work such as we have understood in the past was only right and reasonable with our employees"; that "there were many union men walking the streets without work, when we retained and made work for a lot of people we could have let out without any impairment of our efficiency of operation"; that "before there was any indication of dissatisfaction, our Auditor had already been instructed to prepare a vacation list with the understanding that at the end of May, which was last Saturday, we were going to prepare a further bonus plan for the next six months in addition to the vacation plan with salary"; that "you appreciate that union shops do not give vacations with pay, nor do they share profits and give bonuses"; and that "we think it only right that if any one is now considering a union affiliation that they make it known immediately to our Auditor so he may properly classify everybody for our future plans."

The union held its scheduled organization meeting, and, a few days later, it presented a closed-shop proposal to Blanton, which he refused to consider. He instructed his auditor to take a personal poll of all employees, on whether they preferred the union or the company's profit-sharing plan. Meetings were held with the union committee, in which Blanton repeatedly declared that he would never sign an agreement. In one of the later discussions, he remarked, "I will bargain and I will bargain until the cows come home, but I won't sign a contract with the C. I. O." On June 11, questionnaires, letters and bonus checks were sent out to the employees. Bonus checks ordinarily would not have been distributed until after the end of June. The letter stated that "we are herewith enclosing our final bonus check, which will possibly be the last bonus check that we will give to those employees who have not been satisfied with our Profit-Sharing Plan." It stated also that it appeared reasonably certain that the plant site would soon be condemned for government park purposes and that the company would have to determine whether to remain in St. Louis or locate elsewhere. "The Company will not stay in St. Louis to give employment to people who oppose its policies and what is being done for them."

One of the inquiries in the questionnaire was, "If the Company continues in business in St. Louis or vicinity, would you prefer to have a Union represent you in your labor relations with the Company, or do you have sufficient confidence in the fairness of the management to discuss at any time any grievance you may have?" Each employee was asked to express himself specifically on the following, among other propositions: "I hereby withdraw from the Company's profit-sharing plan and under the conditions understand that there will be no bonus after withdrawal," or "I hereby express my desire to remain in the Company's profit-sharing plan, and my acceptance of the usual six months bonus and readjustment of drawing account will confirm my desire to remain in the plan to the exclusion of any other plan."

On June 15, 1937, after numerous conferences with Blanton, the union called a strike. A majority of the employees left the plant, which was partially shut down until July 17, 1937, when the strike was terminated. In the conferences that occurred during this period, Blanton refused to meet with any union organizers, or to carry on discussions with the union committee while certain employees remained members. The union made substitutions for these committee members, to conform to his wishes.

On July 2, Blanton sent out a notice of a meeting to be held at the plant on July 6, to "make known the labor policy of the Company". This notice was sent to all employees, including the strikers, and recited, "If for any reason you cannot attend the meeting, I would suggest that you write me a letter and tell me that you could not come or did not desire to come under the conditions, as it will be understood that those who do not attend have no further interest in their position with this company, and the Company will so take it." At the meeting a statement was read, which declared, among other things, that there would be no discrimination against any employee by reason of union membership; that the company, however, would not sign any agreement; that its profit-sharing plan was being withdrawn "and will not be reinstated until such time as the management is absolutely assured that it will be appreciated by a substantial number of the employees"; that "this Company has paid employees full time when away on account of sickness, some em-

ployees having been carried as much as months at a time, and it is submitted that this is contrary to union practice, and this policy will not be continued"; that "it is only right and reasonable that all employees know that there is a serious question as to whether the Company will continue to operate in St. Louis, and all employees now have the right to protect themselves against future contingencies over which we have no control"; and that "the management has the right and will exercise it as it sees fit to put in labor saving devices." The statement, of course, covered other matters also, which we need not discuss here.

After further discussions with the union committee, from which, as we have indicated, the members objectionable to Blanton had been removed, the strike was terminated. The committee finally accepted Blanton's proposed wage scale, although under it the earnings of the employees would be less than what they had previously received in wages and profit-sharing benefits. Blanton, in reporting the termination of the strike to the regional office of the Board, frankly stated that "we doubt exceedingly whether labor is going to be satisfied with the bargain its Committee has made based on the conditions prevailing at the time when this new plan became effective". Although the record clearly shows that the union had a majority of the plant employees as members, Blanton agreed to recognize the union as the bargaining agent for its membership only, and not for the other employees.

The dissatisfaction which Blanton knew would result after the wage scale had been put in operation inevitably followed. The union did not attempt to function very much after the termination of the strike. Before long, its officers apparently did not even call meetings. The president of the union had been one of the members of the negotiating committee, but he was not one of those to whom Blanton had interposed objection. About a month after the strike, according to Blanton, the union president told him the employees wanted to change the strike settlement terms, and in that connection declared that "there is no C. I. O. union". Blanton immediately dictated and had mimeographed statements, to be circulated by the union president and to be signed by each individual employee, declaring, "Effective this date I desire to conduct my labor relations

with the management of the Company". Practically all of the employees signed the statements, and, when they were returned to Blanton, he issued a letter declaring that approximately 100 per cent of the employees had indicated their desire to conduct their labor relations direct with the management, and that the company was accordingly considering a return to its former profit-sharing plan. The profit-sharing plan was promptly restored.

On January 11, 1938, the St. Louis regional director of the C. I. O. wrote the company a letter, requesting a conference on behalf of the union, to discuss wages and the reinstatement of a number of workmen who had not been re-employed after the strike. Blanton summoned the negotiating committee, with whom he had settled the strike, and had them sign a letter, which he had prepared, addressed to the National Labor Relations Board at Washington, D. C. The letter recited that, in the opinion of the signers, there was no necessity for re-opening the subject of wages; that the employees were satisfied with their labor relations; that "this Committee is continuing to function as a representative of the employees in a general way without any company union"; and that "it is our best opinion that we do not need any outside representation".

In June, 1938, charges were filed against respondent in the regional office of the Board, such charges being signed, "United Creamery Workers of America, affiliated with Committee for Industrial Organization, by James T. Nash, Field Representative C. I. O." The Board's regional director issued a complaint, and the hearing here involved followed. At the hearing, the name of the union was changed from "United Creamery Workers of America", which had been adopted for preliminary organizational purposes, to "United Oleomargarine Workers Local Industrial Union No. 489", which was its correct charter title.

The first ground on which respondent challenges the Board's right to an order of enforcement is the claim that the charges on which the complaint was issued were not sufficient to give the Board jurisdiction. The principal contention in this regard is that the United Creamery Workers of America, or the United Oleomargarine Workers Local Industrial Union No. 489, as it was designated in its charter, had been abandoned and was not an existing labor organization at the time the charges were filed. In its answer filed to the complaint, the only issue attempted to be raised on this point was the following: "Respondent states that it has no knowledge whether or not United Creamery Workers of America, hereinafter called the Union, is affiliated with the Committee of Industrial Organization, or that it is a labor organization as defined in Section 2, subdivision (5) of the Act, [29 U.S.C.A. § 152(5)], and therefore calls upon complainants for proof thereof". In the exceptions filed to the trial examiner's report before the Board, respondent sought to claim that the evidence did not show the authority of James T. Nash, who had signed the charges, "as an agent for said alleged union to make the said charges upon which the complaint is based". Under Article II, section 10 of the Rules and Regulations of the Board, however, respondent was required to challenge specifically in its answer any fact in the complaint which it wished to place in issue, or the Board would be entitled to consider any facts not so challenged as sufficiently established. If Nash's authority was a material fact, it was not challenged in respondent's answer. The Board was at liberty in any event, under the circumstances, to ignore it in the exceptions filed after the hearing was concluded, and we will not consider it here.

■ As to the affiliation of the local union with the C. I. O., if that question is material here, there is adequate proof in the record. The application cards signed by the employees were for membership in the C. I. O. In addition, while the charter of the local union was not introduced in evidence, there was testimony on the part of some of the witnesses, which was received without objection, to the issuance of a charter by the C. I. O. to the local union, and there was no evidence of any surrender of the charter or of any formal action to sever the affiliation.

■ The Board held that charges had properly been filed by a labor organization, under sections 10(b) and 2(5) of the Act and Article II, section 1 of the Board's Rules and Regulations. Respondent's contention that the union did not have any existence after August, 1937, is a matter of its own construction and inference. True, the union had become more or less inactive, and respondent had been able to obtain cards signed by almost all of the employees

that they were desirous of conducting their labor relations with the management. But, neither this, nor the attempt of the president to declare that "there is no C. I. O. union", nor the fact that no meetings were being called by the officers, was alone sufficient to destroy the status of the union as a labor organization under the Act. It had never been formally dissolved, and twenty persons, under the charges filed, were asserting its authority to act for them in their grievances against respondent. Furthermore, respondent for some reason seemed to think it necessary or advisable to summon the members of its previous negotiating committee, when the charges here involved were filed. But, even more than all this, the record seems to us clearly to justify the finding that the dazed condition of the union had been occasioned by the persistent undermining efforts of the employer, as we shall discuss later. Any change in its status from such a cause was not one to which the Board was required to give recognition in favor of respondent. National Labor Relations Board v. Bradford Dyeing Association, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; Bussman Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783; Oughton v. National Labor Relations Board, 3 Cir., 118 F.2d 486; National Labor Relations Board v. Highland Shoe, Inc., 1 Cir., 119 F.2d 218. We hold that the Board could properly find that the union was such an existent labor organization as to entitle it to file charges under the Act.

This disposes also of respondent's contention that it could not legally be required to bargain collectively with a non-existent union, or of any claim that might ordinarily be made that the union no longer represented a majority of the employees of the plant. We shall refer later again to the fact that, under the evidence, the Board was justified in holding that respondent's conduct constituted a course of unfair labor practices under the Act. It is clear, on the point now being considered, that the unfair labor practices of an employer cannot of themselves operate to affect the status of a union, as collective bargaining representative, previously selected by an untrammelled majority will. National Labor Relations Board v. Bradford Dyeing Association, supra. In effectuating the policies of the Act, the Board is entitled, in such a situation, to exercise its discretion to require the employer to continue to bargain collectively with the previously selected agent. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32.

The next contention of respondent is that the strike was unjustified and illegal, and that the Board therefore had no right to order it to make reinstatement of any of the employees whom it had refused to re-employ. It is claimed that the record clearly establishes that the strike was not due to respondent's refusal to bargain with the union, but to Blanton's refusal to sign a preliminary stipulation that he was willing to recognize the union as the sole collective bargaining agency. The evidence indicates that the union had requested Blanton to sign such a preliminary stipulation, but it had also requested him to agree that at the close of the bargaining negotiations he would reduce to writing and sign any agreement that might be reached. Blanton declared he would never sign anything. He said he was willing to carry on negotiation discussions, but took the position that under the law he could not be compelled to enter into a written agreement. At the close of the conference, which preceded the strike, he dictated a statement which concluded with the declaration that "he still desires to negotiate with Mrs. Sentner's Committee, but cannot negotiate contrary to law". The negotiations never got beyond this point.

The contention that the strike was due exclusively to Blanton's refusal to sign a preliminary stipulation, agreeing to recognize the union as the sole collective bargaining agency of the plant, is obviously merely respondent's interpretation of the situation. The strike followed Blanton's arbitrary and untenable refusal ever to sign anything, and the Board could properly find under these circumstances that the union was justified in calling a strike for his failure to bargain in accordance with the provisions of the Act.

Such a refusal demonstrated the futility of any attempt at bargaining, since it left Blanton's good faith utterly open to question. In H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, it was specifically held that the refusal of an employer to sign a written contract embodying the terms of

an agreement which he had reached concerning wages, hours, and working conditions was a refusal to bargain collectively and an unfair labor practice under § 8(5) of the Act, 29 U.S.C.A. § 158(5). Equally so, is such an intention, which is announced or has been determined upon before negotiations are commenced. Compare Wilson & Co., Inc., v. National Labor Relations Board, 8 Cir., 115 F.2d 759. Under the circumstances, as we have indicated, we hold that the conclusion of the Board, that the strike was due to Blanton's refusal to bargain in accordance with the provisions of the Act, was justified and proper.

■ Respondent further contends that there were valid reasons for its refusal to re-employ each of the seven workmen whom the Board ordered reinstated, and that the finding that there had been discrimination with respect to the hire and tenure of their employment was unwarranted. Three of them were claimed to have been slated for discharge on account of inefficiency at the time of the strike. One was claimed to have been so frequently absent from work on account of illness, that his retention could not be justified. Two were plant maintenance employees whose services were said to be no longer required, because of the prospective condemnation of the plant site for government park purposes. The seventh had been an unlicensed assistant engineer, whose employment was claimed to be in violation of a city ordinance.

The reasons urged for the refusal to re-employ these seven men would have had more persuasive force, if the employer's displeasure at their union activity had not been specifically expressed to each one of them, or if dissatisfaction had been indicated with the work of any of them prior to the strike. Compare Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49, 53; National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815, 819. Thus, the assistant engineer referred to had been with the company since 1926, and, so far as the ordinances of the city of St. Louis introduced in evidence were concerned, their casual inspection indicated no reason why he could not have continued to act as a helper to a duly licensed supervising engineer, as he had always done, if the company had wished to retain him. He had served on the picket line, and his superior had declared to him, "George, you've got one more chance to work in this factory * * * I got a paper here for you to sign. Are you for the Company or against the Company?" When he sought reinstatement, according to his testimony, Blanton asked him why he had been on the picket line, and told him to look for another job.

Of the two maintenance men, one had been in the company's employ for 13 years and the other for three. Both had served on the picket line. One of them was told by a vice-president of the company, after the strike, that there wasn't any chance of his being reinstated because "the old man (Blanton) is sore at you". The other had been asked before the strike why he had joined the union and had been told by Blanton that, if he wasn't satisfied, he "could get a job somewhere else".

Of the others refused re-employment, one had been told by an officer of the company that "the old man (Blanton) is pretty sore at you for joining the local and being out on the picket line"; and that "he will not have you on the premises whatsoever." Another, who had acted as treasurer of the union, had been told by his foreman, after the unionization efforts began, that "some of us were going to find ourselves on the street." Still another had been told by Blanton, when he sought reinstatement that he would "keep the men that stuck by him instead of bringing a man that went out and left him during the strike." The seventh was told by his foreman, when he sought reinstatement, that Blanton had given orders to fire him for "participating in the union".

This evidence, which the Board in its powers under the statute had a right to credit, and other facts connected with the situation from which confirmatory inferences also could properly be derived, gave the Board the right to determine whether there had been a refusal to reinstate for present proper causes, or whether, even if proper causes existed, they did not in fact induce the refusal to reinstate, but were, as the Board expressed it, merely "a justification of it in retrospect". See National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 45, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. We think the conclusion of the Board was warranted under the evidence.

■ As to the contention, that one of the seven men should not in any event have been ordered reinstated, because he had

since become engaged in substantially similar employment, the Board nevertheless had the right to order such reinstatement, where, as here, it found that to do so would effectuate the policies of the Act. Phelps Dodge Corporation v. National Labor Relations Board, 61 S.Ct. 845, 85 L.Ed. ——, 133 A.L.R. 1217.

Respondent's final contention is that the Board's finding, that it had been guilty of unfair labor practices, is not supported by substantial evidence. Except for the apparent earnestness with which this contention is urged, we should not ordinarily have undertaken to set out the evidence with as much detail as we have done in this opinion. From the testimony that has been referred to—and there is other evidence in the record also—it is clear to us that, under the limited power of review conferred upon us by the statute, we would have no right to declare that the Board could not properly hold that respondent, despite Blanton's verbal assertion of his willingness to deal with such bargaining representative as the employees might select, definitely sought to prevent unionization of the plant, and that he so maneuvered the situation that the efforts at self-organization finally were frustrated. The attempt to force the employees to choose between the "union plan" and the company's "profit-sharing plan", by suggesting that the "union plan" would likely be followed by lay-offs, loss of bonuses, pay-deductions for illness, and the removal of the plant from St. Louis, while adherence to the "profit-sharing plan" would be rewarded by vacations with pay, further bonuses, and steady employment, clearly could be held by the Board to interfere with, restrain or coerce such employees in their right of self-organization, in violation of section 8 of the Act, 29 U.S.C.A. § 158. Compare Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 104 F.2d 49, 53; National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 478, 479; National Labor Relations Board v. Elkland Leather Co., 3 Cir., 114 F.2d 221, 223. Similarly, the Board was entitled to hold also that respondent had failed to bargain collectively within the meaning of the Act, when it declared that it would never sign any written agreement, as we have discussed above; when it refused to meet certain of the authorized representatives of the union and insisted also upon substitutions in the personnel of the bargaining committee before it would carry on further discussion; when, during the course of its discussions, and notwithstanding the union represented a majority of the employees of the plant, it undertook to go around the committee and to call a meeting of all its employees, in order to make a final declaration of its "labor policy", which was then still supposedly in the process of mutual negotiation. There are other acts also, which we shall not further lengthen this opinion to detail. Clearly, in this situation, the Board was justified in holding that respondent had been guilty of unfair labor practices under the Act.

The Board has requested that, in view of Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6, its order as to back pay be modified to eliminate the provision for the payment by respondent to public work relief agencies of the sums earned by the discharged employees on work relief projects, and this modification will be made as requested.

Since the argument and submission of the cause here, respondent has filed a showing that a rival union affiliated with the American Federation of Labor now claims to have a majority of the plant employees as members, and has made demand upon the employer for recognition as exclusive collective bargaining agent. Such a subsequently arising conflict or controversy as to the proper bargaining agent is not a matter to which we are required to give consideration on a petition for the enforcement of a valid order of the Board. Unless we are definitely convinced that the matter presented has become wholly moot, or that the order of enforcement would be a mere useless formality, we will not ordinarily refuse to enter the enforcement order, simply because of some alleged change in the situation upon which the Board's order was based. Especially is this true where the provisions of the Act enable the Board itself adequately to deal with the situation. Compare Bussman Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783, 788. See, also, National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. The Board is charged with the responsibility of administering the Act and of effectuating its policies, and it is given adequate power under section 9, 29 U.S.C.A. § 159, in the situation here claimed to exist, to determine the facts and

to protect the interests of the parties, in accordance with the spirit and intent of the Act.

An order of enforcement will be entered, with a modification, eliminating the provision for reimbursing public work relief agencies, as requested by the Board.