# NATIONAL LABOR RELATIONS BOARD v. TOWER HOSIERY MILLS, Inc.

## No. 6015.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1950.

Decided March 6, 1950.

William Feldesman, Assistant General Counsel, National Labor Relations Board, Washington, D. C. (David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Marcel Mallet-Prevost and Samuel M. Singer, Attorneys, National Labor Relations Board, Washington, D. C., on brief), for petitioner.

L. P. McLendon and Thornton H. Brooks, Greensboro, N. C. (Thomas D. Cooper, Burlington, N. C., on brief), for respondent.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board requiring respondent, Tower Hosiery Mills, Inc., to cease and desist from refusing to bargain collectively with the American Federation of Hosiery Workers (hereinafter called the Union) as the exclusive representative of all its production and maintenance employees, including certain specified categories of employees, but excluding supervisors, and from in any other manner interfering with the Union's efforts to negotiate for, or to represent the employees in the aforesaid bargaining unit, as their exclusive bargaining agent. Affirmatively, the order requires respondent, upon request, to bargain collectively with the Union, and to post appropriate notices.

Two questions are presented for our determination: (1) Was there substantial evidence to support the Board's finding that respondent, in violation of Section 8(1) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(1) and (5) (hereinafter called the Act), refused to bargain with the Union in good faith? (2) Does the Union's alleged loss of majority status subsequent to the issuance of the Board's order affect the validity of the order?

The Board conducted three elections among respondent's production and maintenance employees, in 1940, 1944 and 1945. The Union won the election of 1940, lost the election of 1944, but won again on December 20, 1945. On January 4, 1946, the Board certified the Union as the exclusive representative of the employees in an appropriate unit at respondent's plant.

On December 31, 1945, respondent posted notices reviving certain working rules, already in existence but for five years prior to that time neither enforced nor reduced to writing. Respondent did not consult the Union with respect to posting these rules. Although respondent's action may not have constituted an unfair labor practice, this conduct tends somewhat to indicate respondent's unwillingness to bargain with the Union.

The Union initiated negotiations with respondent on January 10, 1946. Thereafter conferences were held between the parties on January 24 and 25, 1946. At that time the Union's proposed contract was discussed, clause by clause, and respondent took the position that it could not agree to the principle of binding arbitration, the closed shop clause, compulsory bonus payments, the usual clause banning strikes and lockouts except upon the refusal of either party to carry out an arbitrator's decision, and certain provisions not in line with area practice. On February 6 and 7, 1946,

conferences again took place. The Union withdrew its original closed shop proposal and substituted a proposal for a Union shop with preferential hiring through the Union. It also abandoned its demands for paid holidays. Respondent still insisted upon an open shop and rejected a proposed wage increase without making a counter-offer. The respondent clung to its original position with regard to arbitration, bonuses, overtime and seniority, and no progress was made toward an agreement.

At the meetings of February 6 and 7, 1946, however, an agreement was reached as to the application to respondent's plant of a general area wage increase. But in putting the area increase into effect respondent, without consulting the Union, made changes in piece rates and practices pertaining to the seaming of heels. This action, which resulted in a short spontaneous strike by the employees, is another indication of respondent's attitude towards bargaining with the Union.

From February 28 to April 11, 1946, the Union had a number of meetings with respondent's representatives, and the draft of a contract proposed by respondents was discussed. Agreement was reached on several minor points, the respondent accepted an appropriate bargaining unit substantially the same as that set forth in the Board's Order of Certification, and the Union assented to respondent's vacation plan. Respondent's proposed contract, however, reflected no changes in its position of the earlier conference as to wages, arbitration, seniority or the open shop, and contained no-strike, no lockout and indemnity provisions. The Union strenuously objected to the severe indemnity provisions advocated by respondent.

On March 16, 1946, the Union filed charges with the Board, alleging that respondent had refused to bargain in good faith. At the conferences of April 10 and 11 the Union offered a number of concessions as to Union-security, reduced its wage and holiday demands, and accepted the Company's insurance plan; but the respondent refused to yield on any major point at issue.

Six additional conferences were held between the parties from May 9 through July 11, 1946, but major developments in the negotiations took place in only the conferences held on May 10 and May 23. On May 10, the Union's fourth proposed contract formed the basis of negotiations. Although the parties made substantial progress on relatively minor matters, the major issues continued to divide the parties.*

On July 25, 1946, respondent announced a wage increase in line with a general area increase. The amount of the increase was the same as that requested by the Union on May 10 and rejected by the Company. The announcement of the increase was made without prior consultation with the Union and the seamers' wage rates were again unilaterally adjusted. Although it may be that the Union had already impliedly consented to a general wage increase, the unilateral action of respondent is further evidence of the lack of its co-operation with the Union.

Respondent offered another draft agreement to the Union on August 13, 1946, but did not abandon its original stand on the major issues. Article IX of the proposed agreement read as follows:

"IX. Union Activity and Strikes, and Lockouts:

"(a) The Union and the employees of the Company shall not engage, either directly or indirectly, in union activities on company time except as may be required in the handling of a grievance under step (a), Article VII. A violation of this section shall constitute adequate cause for the Company to discharge the violator, or it may invoke a penalty assessment against the Union's funds in an amount to be agreed upon between the Company and the Shop Committee which shall not be less than $10.00 nor more than $50.00 for each violation.

"(b) The Union, for itself and the employees of the Company, agrees that it will at all times cooperate fully with the Company in maintaining efficient production without interruption and that there shall

be no interference by the employees with the operation of the Company. The Union further agrees that it will not call, encourage, or support any strike, and that there shall be no strikes, work stoppages, spontaneous vacations and slowing down of work, or agitation to do the same, during the life of this Agreement, until the remedies under this Agreement have been completely exhausted.

"(c) In no event will the Union call a general or partial strike or institute a slowing down or stoppage of work until it has complied with the following provisions:

"(1) Conducted a vote by secret ballot under the supervision of a United States Commissioner of Conciliation of all employees to whom the Agreement applies and received a majority vote authorizing the calling of a slowdown or strike within 30 days from the balloting.

"(2) Notified the Company in writing 10 days prior to the commencement of any slowdown or strike which may have been authorized to be taken under (1).

"(3) In the event of a strike or walkout and/or picketing by the employees, there shall be no mass picketing of employees, but such picketing activities will be limited to peaceful persuasion, without threat or threats of any kind, and by a group of persons not exceeding 10 in number, 10 feet apart, at any entrance to the plant of the Employer, and no effort will be made to interfere with the right of any person to enter or leave the premises of the Employer.

"(d) Participation in a strike, or any work stoppage or slowing down of work, or agitation to do the same, before the remedies under this contract have been exhausted by the parties hereto, or before Subsection (c) has been complied with, shall be cause for the dismissal of such employee or employees who participate therein, and the Company shall not be obligated to reinstate or re-employ such employee or employees.

"(e) The Union by one of its international officers and by its local President, shall repudiate any strike or other concert-

ed cessation of work whatsoever by any group or number of employees that has not been called by the Union after being so authorized; and shall declare that any picket line set up in connection therewith is illegal and not binding on members of the Union. The repudiation and declaration shall be communicated to the Company in writing within 72 hours after the cessation of work by the employees, or the forming of the picket line respectively.

"(f) In addition to any other action which the Company may hereunder or otherwise lawfully take, any employee participating in an unauthorized strike or other concerted cessation of work not called by the Union shall be liable to a fine of $3.00 a day for every day's absence from work and the loss of one year's seniority for every continuous absence for a calendar week or part thereof.

"(g) If the Union violates this article, it shall be liable to a minimum penalty of $500.00 cash per day per plant, payable to the Company within 30 days. Such amount shall constitute liquidated damages suffered by the Company as a result of the unauthorized stoppage of work, and if payment is not made within the specified period, same may be reduced to judgment in any competent court of record."

The stringent provisions of Article IX penalize the Union quite severely. The provision penalizing the Union for the conduct of employees who engage in Union activities on Company time, was apparently previously unheard of in this area. This provision would impose a tremendous burden on the Union, which would be hard put to control all of its members all of the time. The other provisions seem to have resulted from an attempt by respondent to cull the most drastic provisions it could discover embodied in other contracts. Article IX was made the *sine qua non* of agreement on the part of respondent. Yet respondent must have been well aware that the Union would never agree to any contract containing Article IX *in toto*.

After an ineffectual meeting on August 16. the Union, on August 23, 1946, requested respondent to sign an agreement em-

bodying at least all the matters which had been agreed to by the parties in the previous negotiations. The draft agreement tendered to respondent for this purpose, was almost entirely in the language of the Company and included all the concessions previously made by the Union and, in addition, a new concession accepting respondent's position with respect to optional arbitration of grievances. The draft agreement excluded subjects, such as Union security, wages, bonus, strikes and lockouts, as to which the parties were still in disagreement. Respondent promptly rejected the Union's proposed agreement on the ground that the contract was incomplete and the items incorporated therein merely represented "tentative" agreements, subject to the negotiation of an entire contract.

A conference was subsequently held on August 27 where respondent made certain concessions and the Union offered to recede on all points except Article IX and even to accept paragraphs (a) (except for the penalty assessment provision) and (e) of Article IX. On November 4, 1946, the date of the final conference, the Union agreed to accept clauses (b), (c) and (d) of Article IX. But on both occasions the respondent insisted that the Union agree to Article IX in its entirety. On November 8 respondent indicated in a letter to the Union that it would meet with the Union if requested but that it would never agree to any contract not containing the provisions of Article IX.

The uncompromising attitude of respondent towards Article IX provides the final insight into respondent's lack of good faith in its negotiations with the Union. Instead of compromising on the indemnity provisions, respondent made them increasingly severe. Throughout the negotiations it is apparent that respondent lacked a sincere purpose to reach an agreement. In Great Southern Trucking Co. v. National Labor Relations Board, 4 Cir., 127 F.2d 180, 185, we said: "An employer may not have a mind 'hermetically sealed' against the acceptance of the proper procedure of collective bargaining in good faith; nor may an employer engage in such Fabian tactics as will practically render abortive the stat-utory rights of the employees." See, also, N. L. R. B. v. Corsicana Cotton Mills, 5 Cir., 1949, 178 F.2d 347; N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, certiorari denied, Andrew Jergens Co. v. N. L. R. B., 338 U.S. 827, 70 S.Ct. 76; N. L. R. B. v. Highland Shoe, Inc., 1 Cir., 119 F.2d 218.

■■■ The courts, under the Act, will never compel an employer to accept a particular contract. But when there is substantial evidence that the employer is unwilling to bargain in good faith, we will not withhold our mandate. Jeffery-De Witt Insulator Co. v. N. L. R. B., 4 Cir., 91 F.2d 134, 139, 112 A.L.R. 948, certiorari denied. 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565. We think that the Board's finding that respondent was guilty of an unfair labor practice in failing to bargain collectively with the Union in good faith was supported by substantial evidence. Respondent's unilateral action, its insistence upon the harsh provisions of Article IX, its refusal to enter into an agreement with respect to matters no longer at issue, and the long and fruitless negotiations viewed in the light of the Union's many concessions, justify the conclusion that the respondent acted in bad faith.

■■■ The second question here involved is whether the Union's alleged loss of majority affects the validity of the Board's Order. In Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 687, 64 S.Ct. 830, 835, 88 L.Ed. 1007, Chief Justice Stone said: "Petitioner cannot, as justification for its refusal to bargain with the union, set up the defection of union members which it had induced by unfair labor practices, even though the result was that the union no longer had the support of a majority. It cannot thus, by its own action, disestablish the union as the bargaining representative of the employees, previously designated as such of their own free will. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 339, 340, 60 S.Ct. 918, 929, 84 L.Ed. 1226; International Ass'n of Machinists v. Labor Board, supra, 311 U.S. [72] page 82, 61 S.Ct. [83] page 89, 85 L.Ed. 50; cf. National Licorice Co. v. Labor Board, supra, 309 U.S,

[350] page 359, 60 S.Ct. [569] page 575; 84 L.Ed. 799."

Respondent contends that subsequent to the issuance of the Board's Order, 80% of the employees in the unit signed a petition for decertification of the Union and that the proceedings here should be remanded to the Board for determination of the causes of this defection. But in N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 172 F.2d 813, 816, Judge Parker, speaking for this Court, stated:

"The company says that there has been a great change in the personnel of its employees since the order was entered and that there is no certainty that the union now represents a majority. The answer to this, however, is that the company has never complied with the order to bargain and any loss of majority may be attributed to that fact. We dealt fully with the question thus presented in Great Southern Trucking Co. v. N. L. R. B., 4 Cir., 139 F.2d 984; N. L. R. B. v. Appalachian Electric Power Co., 4 Cir., 140 F.2d 217; and N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 640. In the case last cited, where the question arose upon a motion to remand the case to the Board for further findings because of lapse of time and alleged loss of majority, we said:

" 'Respondent is not faced with conflicting claims as to representation, but raises the question as to the authority of the union to represent its employees as a means of escaping any obligation to bargain at all. In such case it is reasonable to presume that the authority of the bargaining agent continues until the contrary be shown. See National Labor Relations Board v. Remington-Rand, 2 Cir., 94 F.2d 862, 870; National Labor Relations Board v. Biles-Coleman Lumber Co., 9 Cir., 96 F.2d 197, 198; National Labor Relations Board v. Louisville Refining Co., 6 Cir., 102 F.2d 678. * * *

" 'It is reasonable to assume, moreover that any decline in union membership has been due in large measure to refusal of respondent to bargain with the union as representative of the employees in the manner contemplated by the Act of Congress; and,

in such situation, an order requiring respondent to bargain as contemplated by the Act is reasonably necessary to overcome the effect of the interference with self organization resulting from the refusal to bargain. An employer should not be allowed to discredit a bargaining agent selected by an overwhelming majority of his employees by refusal to bargain with it and then take advantage of the loss of membership due to his wrongful act as an excuse for refusing to recognize it as a bargaining agent. It must be remembered that the union represents the employees, not the employer; and, if a majority of the employees are not satisfied to be represented by it, they can apply to the Board for relief.' "

Thus there is ample authority for the proposition that the loss of Union majority subsequent to the issuance of the Board's Order, under the factual situation here involved, did not affect the validity of the Order.

The Board's findings are supported by substantial evidence that respondent has violated Section 8(1) and (5) of the Act, and the Board's Order, based on these findings, is valid under the Act and will be enforced.

Order enforced.

SOPER, Circuit Judge, dissenting.

I do not think that the order of the Labor Board is supported by substantial evidence. It is perfectly plain that the order finds no support in the posting of rules governing the conduct of the employees in the plant which were fair and reasonable; and that the order is not supported by the second increase of wages without previous formal approval of the union, since the union gave its approval to the first and third increases in wages, was notified in advance of the second increase and understood and approved the policy of the employer of keeping pace with increases in wage rates in other parts of North Carolina, for which purposes all three wage increases were made. It is noteworthy that the trial examiner found no fault with the action of the employer in these two respects.

It seems equally clear that the employer had the right to insist upon penalties which would be imposed upon the union only if it would violate its contract. The parties met nineteen times for negotiations in an attempt to adjust their differences. They split in the end largely on the question of union liability for breach of contract, and it cannot justly be said that the employer refused to bargain because it would not recede from its position on this crucial point. To make such a holding does not promote collective bargaining. On the contrary, it interferes with the freedom of the parties because it enables the Board, with the approval of the court, to put pressure on one of the negotiators to accept an agreement to which it objects. In the end the Board will be the arbiter as to what terms the employer may reasonably insist upon and an approach to compulsory arbitration will have been made which the statute does not contemplate.